**Henryk de KWIATKOWSKI, Plaintiff,**

v.

**BEAR STEARNS & CO., INC., Bear Stearns Securities Corp., and Bear Stearns Forex Inc., Defendants.**

**No. 96 CIV. 4798(VM).**

United States District Court, S.D. New York.

Dec. 29, 2000.

Paul J. Curran, Kaye, Scholer, Fierman, Hays & Handler, New York City, for plaintiff.

Dennis J. Block, Jonathan D. Polkes, Cadwalader, Wickersham & Taft, Dennis J. Block, Weil, Gotshal & Manges, LLP, Paul A. Engelmayer, Wilmer, Cutler & Pickering, New York City, for defendants.

**DECISION AND ORDER**

MARRERO, District Judge.

## TABLE OF CONTENTS

INTRODUCTION ................................................... 677

FACTS ......................................................... 678

RULE 50(b) and RULE 59(a) STANDARDS ........................... 683

DISCUSSION .................................................... 683

 I. LAW OF THE CASE .......................................... 683

 II. JURY INSTRUCTIONS ...................................... 686

 III. CLAIMS OF ERROR ....................................... 687
 A. Bear Stearns as Investment Advisor ..................... 687
 B. Theories of Negligence ................................ 688
 C. Failure to Advise .................................... 688
 D. Absence of Duty ..................................... 689

 IV. APPLICABLE LEGAL PRINCIPLES .......................... 690
 A. Bases for the Broker's Duties ......................... 690
 1. The Broker as Agent ............................ 691
 2. The Broker as Fiduciary ......................... 693
 3. The Duty of Due Care ........................... 694
 4. Negligence and Contract ......................... 694
 5. Negligence and Breach of Fiduciary Duty ........... 695
 6. Standards of Due Care ........................... 696
 7. Policy Considerations for Fiduciary/Due Care Duty Distinction ........... 697
 B. Evolution and Application of Due Care Principles ......... 697

 V. APPLICATION OF DUE CARE PRINCIPLES ................... 701
 A. Special Circumstances ................................ 701
 B. Advisory Relationship ................................ 705
 C. Bear Stearns's Fees .................................. 708
 D. Breach of Due Care .................................. 710
 1. Placement of the 1994 Foreign Currency Position ...... 711
 2. Monitoring the Accounts ......................... 713
 3. Optimistic Assessments .......................... 714
 4. The Negative Forecasts .......................... 714
 5. Rising Risk to the Securities Accounts ............. 717
 6. The Liquidation ................................ 717
 7. Summary/Conclusion ............................ 718
 E. Mixed Verdict ....................................... 719
 F. Scope and Determination of the Duty of Care ............ 720
 G. The Court's Conclusion ............................... 723

 VI. POLICY CONSIDERATIONS ................................. 724

ORDER ........................................................ 727

## INTRODUCTION

Plaintiff Henryk de Kwiatkowski ("Kwiatkowski") brought this action against defendants Bear, Stearns & Co., Inc.; Bear, Stearns Securities Corp.; and Bear, Stearns Forex Inc. (collectively, "Bear Stearns") alleging, among other things, breach of fiduciary duty and negligence in connection with Bear Stearns's handling of his brokerage accounts. After trial, the jury rendered a verdict in favor of Kwiatkowski on the negligence claim in an amount of $111.5 million, on which he was entitled as of right to statutory prejudgment interest of approximately $60 million that was then added by the Court. Bear Stearns now moves pursuant to Federal Rules of Civil Procedure 50(b) and 59(a) for judgment as a matter of law and, in the alternative, for a new trial. For the reasons discussed below, the motions are denied.

Kwiatkowski is an exceptionally wealthy individual who, through accounts he maintained at Bear Stearns under his own management and control, in late 1994 purchased a position in foreign currency futures contracts worth approximately $6.5 billion. In this venture, a form of investment some experts consider inherently risky, he lost an estimated $215 million in a space of a few weeks in early 1995. Subsequently, he commenced the case now before the Court against Bear Stearns, one of the nation's largest investment banking firms, to recover his losses. As the action went to trial, Kwiatkowski alleged two legal theories for recovery: breach of fiduciary duty and negligence. The jury found Bear Stearns liable on the

negligence claim but not for breach of fiduciary duty.

Bear Stearns contends that the jury's award represents a miscarriage of justice, and that, not only by reason of its size, but by the allegedly new legal duties this determination would place on all securities dealers if the verdict were allowed to stand, the case has generated "shock and attention in the brokerage and legal communities." Memorandum of Law in Support of Defendants' Motion for Judgment as a Matter of Law and, in the Alternative, for a New Trial, dated June 15, 2000 ("Defendants' Memorandum"), at 14.[1] In asserting that something here has gone awry, Bear Stearns asks this Court to intervene and set aside the jury's verdict, either by undoing certain previous rulings of this Court, and potentially those of the judge who managed earlier proceedings of the litigation, or by overturning the jury's factual determination.

The sheer magnitude of the jury award and the extraordinary relief Bear Stearns now seeks evince the high stakes at issue here as perceived by the parties and third persons otherwise following the outcome. But if the matter is critical to particular interests before the Court, it is fundamental as well in other respects. At bottom, Bear Stearns's challenge implicates some vital legal principles. Foremost among the underlying issues is the proper balance of labor our legal system prescribes for the respective roles of the judge and the jury not only in this case, but generally. What Bear Stearns urges must rank among the most demanding judgments any court is

---

1. Bear Stearns cites and quotes various media accounts and professional commentary about this case: James Grant, "Heads you Win, Tails Call A Lawyer," Financial Times (June 11, 2000) ("If brokers are going to be held responsible for the losses of consenting adults, why should anyone own a brokerage stock?"); Charles Gasparino & Randall Smith, "Bear Stearns To Pay Investor Damages In Suit," Wall St. Journal (May 17, 2000) (describing verdict as "shocking") (quoting Professor John Coffee); "Big Jury Award Against Bear Stearns," New York Times (May 17, 2000) (verdict "will raise eyebrows all over Wall Street"); and Marshall H. Fishman & Dan A. Rosenbaum, "Fiduciary Duties Affect Broker–Customer Relations," N.Y.L.J. (June 5, 2000) (broker-dealers must now be aware that if they render advice or discuss investment strategy, "duties broader than those intended may be imposed"). See id. at 14.

called upon to render: to recognize and correct not only alleged errors of its own and possibly of other judges, but, of larger scope and implications, to weigh a jury's verdict against the Court's own assessment of the evidence adduced at trial and to determine in effect whether to substitute the judge's own perceptions and judgment of the facts for those of the jurors charged to decide faithfully and impartially the factual issues in dispute.

So framed, one of the highest values here on the line, as gauged by this Court, is not the financial interests the parties may stand to gain or lose, but the integrity of the judicial system itself, as measured by the due respect and protection that must be accorded to the rightful offices of judge and jury in the constitutional enterprise in which they share appointed duties.

In fact, the most prominent question Bear Stearns's motions bring to this Court implicates the concept of legal duty, specifically its application to the relations between the litigants here. But in resolving this issue for these parties, the Court must first construe and settle what duty the Court itself is bound by its office to discharge. For this purpose, this Court fixes a rigorous mark. From its perspective, the most delicate and trying demand placed upon any court on these occasions is to decide when and under what circumstances, even if a jury's award stirred vigorous reaction from any litigant, or engendered adverse public pressures, perceptions or apprehensions, or indeed even were the Court itself to harbor any personal qualms agitating that somehow "this isn't right," the verdict should be allowed to stand. The proper basis for this judgment must rest upon whether the guided path of the law so directs; whether the award is supported by rational grounds; and whether the effect of overriding the jurors' determination would be to intrude upon their

proper domain, diminish the acceptable latitude the jury is warranted in order to exercise its role, and upset the constitutional division of authority in the administration of justice.

This is a solemn task. For the sake of the justice system whose values we prize, the exercise of judicial discretion it demands should be justified only in the most compelling circumstances. The Court's duty at hand compels it to rule as the law commands. It can do no more. Insofar as the stakes are high all around, so the burden of persuasion must be exacting. Bear Stearns has not persuaded this Court that the jury's verdict should be disturbed.

## FACTS[2]

Kwiatkowski is a Canadian citizen. During the times relevant to this litigation, he resided in Nassau, Bahamas and maintained his business offices there. A native of Poland, he escaped from the Germans and later from the Russians during World War II, making his way to England. After the war, he began an extraordinarily successful career in the aviation business, first leasing airplanes for an American manufacturer and later establishing his own company to produce and market helicopters. To his aviation industries, Kwiatkowski later added businesses in horse breeding and real estate, purchasing the renowned Calumet Farm and Kennelot Stables in Kentucky.

Kwiatkowski opened securities accounts with Bear Stearns in 1988, when Albert J. Sabini ("Sabini"), who had been his broker at EF Hutton, moved to Bear Stearns. At Bear Stearns, Kwiatkowski's accounts were handled by the firm's "Private Client Services Group", which provided large private investors with services akin to those it offered to governments and institutions, such as access to Bear Stearns's experts and executives. Sabini, who later became a managing director at Bear Stearns, con-

---

**2.** The facts set forth here have been gleaned from the trial transcript in this matter. The analysis of the facts contained in Part V, *infra*, provides a more detailed description of the underlying events and specific references to the pertinent pages of the trial record.

tinued as his lead broker and principal contact at the firm. Until March 1995, the two communicated daily about news and market reports that might affect Kwiatkowski's investments and regularly reviewed the status of Kwiatkowski's accounts. Sabini also forwarded relevant market reports and other Bear Stearns documents to Kwiatkowski when requested or as he deemed appropriate.

Until January 1991, Kwiatkowski maintained only securities accounts at Bear Stearns. At that time, he opened a foreign currency futures account there by transferring from Bank Leu in the Bahamas a position consisting of 4,000 Swiss franc contracts traded on the Chicago Mercantile Exchange (the "CME").[3] Kwiatkowski believed in the strength of the United States dollar and traded consistently in long-term positions favoring the U.S. dollar against other currencies.

As of the time of the transfer of his foreign currency account, Kwiatkowski had experienced losses amounting to approximately $69 million at Bank Leu. Kwiatkowski testified that he felt compelled to move the position because Bank Leu was too small to service the account and that he recalled Sabini having extolled the capacity of Bear Stearns to provide him the full services and resources he needed for large-scale foreign currency trading. Upon opening the account, Kwiatkowski transferred large holdings of stock and United States Treasury bonds to Bear Stearns to meet the collateral demanded by Bear Stearns.

At the time he opened his Bear Stearns foreign currency trading account, on January 16, 1991, Kwiatkowski signed a Commodity Futures Customer Agreement. In that document, provided in compliance with government regulations and securities industry practices, Kwiatkowski acknowledged that commodity futures trading is

highly risky. Further, he declared his net worth to be $100 million, with liquid assets of $80 million, and affirmed that his investments were within his means. On the same day, Bear Stearns also furnished and Kwiatkowski acknowledged receipt of a standard Risk Disclosure Statement, which elaborated the risks associated with commodity futures trading, including the potential for losing more than the funds deposited as collateral for margin accounts, the parties' rights and obligations relating to margin calls, and the difficulties of liquidating a position or limiting loss exposure to any pre-determined amount.

During this initial period of trading foreign currencies at Bear Stearns, Kwiatkowski continued the same pattern of purchasing futures contracts favoring the dollar against other currencies. From September 1992 through January 1993, he increased his futures position to 16,000 contracts on the CME. He testified that prior to doing so, he spoke to Sabini and to Bear Stearns's chief economist, Lawrence Kudlow ("Kudlow"), and that Kudlow indicated that the dollar then represented an investment opportunity because it was undervalued. Kwiatkowski closed the position in January 1993, having made profits of approximately $219 million. Kwiatkowski did not engage again in foreign currency trading at Bear Stearns or elsewhere until the fall of 1994.

Beginning in late October 1994, Kwiatkowski once again entered the foreign currency market, encouraged by his understanding that his continued confidence in the long-term strength of the U.S. dollar was shared by Bear Stearns's experts with whom Sabini put him in contact. Specifically, Kwiatkowski asserted that Bear Stearns's then chief economist, Wayne Angell ("Angell"), was bullish on the dollar. According to Kwiatkowski, relying in part on the advice and opinions of Sabini and

---

**3.** The CME is a government-regulated board of trade where transactions are conducted, typically through brokers in standardized amounts of a commodity for future delivery, known as "futures contracts." Currency futures on the CME are transferrable agreements based on changes in the market value of global currencies over a set term.

other Bear Stearns experts, he began to mount a position on the CME that by late November had grown to 65,000 foreign currency contracts in equal amounts of Swiss francs, German marks, Japanese yen and British pounds, worth approximately $6.5 billion. These contracts represented as much as 30 percent or more of the CME's open interests in some of the currencies. In mid-November, when Kwiatkowski had acquired the bulk of contracts and continued augmenting his position, Sabini discussed with and transmitted to Kwiatkowski a copy of Bear Stearns's Global Futures Marketing Strategies Report prepared by Bear Stearns's analysts indicating that the dollar represented an investment opportunity.

As Kwiatkowski's commitment rose to 65,000 contracts, the Bear Stearns Executive Committee (the "Executive Committee") approved Kwiatkowski's maintaining the account at that level subject to an increased collateral requirement of $300 million. Also in November 1994, the Executive Committee and Bear Stearns's senior managers assumed direct supervision of Kwiatkowski's foreign currency account, removing it from the purview of the firm's general compliance department.

All of Kwiatkowski's futures contracts were due to expire in early December 1994, thus requiring that the positions be closed or rolled over to March contracts. In late November, the circumstances relating to Kwiatkowski's foreign currency trading at Bear Stearns came to the attention of David Schoenthal ("Schoenthal"), head of Bear Stearns Forex Inc., the firm's foreign exchange entity. Schoenthal believed that Kwiatkowski's position was too large to be traded on the CME. In his view, the visibility of the position in the market and the limited capacity of the

CME would prevent Kwiatkowski from liquidating his position if he had to do so in a short period of time. Schoenthal discussed the matter with the Executive Committee and expressed a view that it would be more advantageous for Kwiatkowski to roll his CME contracts into the over-the-counter (the "OTC") market, where he would benefit from less visibility and greater liquidity.[4]

Following discussions with Sabini and Schoenthal, before the contracts expired in December 1994, Kwiatkowski decided to retain half of his position on the CME, rolling his contracts over into the March expiration, and to move the other half to the OTC market. Kwiatkowski testified that although he did not fully understand how the OTC market worked, he authorized the transaction on the strength of the advice he received from Sabini and Schoenthal, including assurances from Schoenthal that if anything went wrong with his investment on the OTC market, Schoenthal could get him out "on a dime".

In connection with this transaction, Bear Stearns requested early in December 1994 that Kwiatkowski execute a renewed customer agreement. Kwiatkowski declined to sign the long form of Bear Stearns's standard contract, eventually accepting a shorter letter from Bear Stearns's counsel that on January 19, 1995 he acknowledged having received and read. In it, Kwiatkowski reiterated his familiarity with the risks associated with foreign currency transactions and acknowledged that, if he failed to meet margin calls, Bear Stearns was authorized to liquidate his open foreign currency positions and other assets pledged to the firm.

Kwiatkowski realized substantial profits from his initial trading in the two markets.

---

**4.** The OTC market is an unregulated international market in which very large-scale investors, including governments and major banking institutions, trade commodities. With more participants and much greater amounts traded, the OTC market is more liquid, and a single investor's trades are less likely to impact on the market itself. Although the CME and OTC markets generally move together, with minor price variations, the OTC is unlike the CME in that trading can occur at any time and generally occurs directly between participants, without an exchange and often without brokers.

From October 28 through December 21, 1994, he had drawn gains of about $228 million. However, on December 28, 1994, the U.S. dollar declined sharply, and Kwiatkowski suffered a single day's loss of over $112 million spread evenly between his CME and OTC positions. Kwiatkowski paid Bear Stearns's margin call as required. He testified that he then expressed concern about the dollar and considered liquidating the account but that Sabini and Schoenthal reassured him that during the holidays trading generally decreased and the lower liquidity tended to drive prices down. In fact, on the next day, the value of the dollar rose again, enabling Kwiatkowski to recoup nearly $50 million.

Beginning in early January 1995, the currency markets grew increasingly volatile. On January 9, another large drop in the value of the dollar caused Kwiatkowski's position to lose nearly $100 million. According to Kwiatkowski, he then again weighed whether to close his foreign currency position and had a conversation with Sabini and Angell in order to obtain an explanation for the market's decline. By Kwiatkowski's account, Angell expressed a view that the dollar was undervalued and would rebound; Sabini recalled that Angell's position was either noncommittal or incomprehensible. In either event, Kwiatkowski asserted that following that conversation he felt sufficiently assured to remain with the full position.

By the end of January 1995, however, the currency markets had continued their volatility. At that point, Kwiatkowski had a discussion directly with Schoenthal about the United States government's policy goal of strengthening the value of the yen relative to the dollar. Following that conversation, Kwiatkowski sold half of his yen contracts and shortly later closed the balance after Sabini expressed concern to Kwiatkowski's accountant, Themis Themistocleous ("Themistocleous"), about the size of Kwiatkowski's foreign currency investment in light of market conditions and recommended to Themistocleous that he urge Kwiatkowski to reduce the position.

Through February and into March 1995, the value of the dollar steadily weakened. In fact, prior to this period, Bear Stearns's foreign currency analysts had changed their opinions about the strength of the dollar relative to other currencies. In the firm's monthly Global Futures Marketing Strategies publications for February and March 1995, the experts downgraded their forecast for the dollar to negative. Bear Stearns also issued a report containing one in-house expert's opinion that the German mark and Swiss franc were particularly likely to gain strength against the dollar. Kwiatkowski asserts that despite his large long-term position supporting the dollar, he was never provided these materials or any other information regarding Bear Stearns's revised forecasts and that Sabini did not apprise him of Bear Stearns's changed outlook in this regard. Sabini testified that he had no recollection of having provided the information or discussing the matter with Kwiatkowski.

After other significant losses in Kwiatkowski's trading in mid-February, Kwiatkowski stopped paying his margin calls directly, asking that positions be liquidated instead to pay the resulting debts. At the same time, Bear Stearns was becoming concerned about the sufficiency of Kwiatkowski's collateral to cover margin calls and requested additional security. Kwiatkowski declined to provide such security and reiterated that Bear Stearns should instead liquidate positions as a means of payment of his margin debt. Bear Stearns officials testified that it was their understanding that Kwiatkowski merely expressed a preference to liquidate some positions rather than send more cash to satisfy margin calls.

During the economic uncertainty prevailing during this period, the Executive Committee grew concerned that Kwiatkowski's position might have to be liquidated over the three-day Presidents Day weekend in February 1995. At that time,

Sabini and other Bear Stearns officers reported to work in order to assist in liquidating Kwiatkowski's remaining position and to secure Bear Stearns's interests in the event the market turned sharply against him. According to Kwiatkowski, he was unaware of Bear Stearns's concern that the market was precarious enough at that point that such a liquidation of his accounts was a possibility.

On Friday, March 3, 1995, the dollar began another precipitous decline against the Swiss franc and German mark, the two currencies in which Kwiatkowski held remaining contracts. Having experienced another large loss that day, Kwiatkowski contended that he expressed interest to Schoenthal in selling his positions. Schoenthal and Sabini, however, informed him that it would be unwise to begin liquidating contracts on a Friday afternoon because traditionally the liquidity of the markets decreases at that time. Instead, they expressed a view that any further liquidations necessary should be postponed until Sunday, March 5, and be resumed when foreign currency trading opened in Australia and New Zealand and later in Asian markets. Kwiatkowski asserts that it was solely on this advice that he decided not to sell off the balance of his position that day.

In fact, the value of the dollar continued to fall over that weekend. Bear Stearns management decided to staff its trading desk on Sunday, March 5, under Schoenthal's supervision. By the opening of the Australia, New Zealand and Asian markets that morning, the dollar's value had already declined, and it continued to do so during the course of the day, not only diminishing the value of Kwiatkowski's position, but eventually requiring liquidation of his pledged equity in order for Bear Stearns to avert the financial exposure of an unsecured debt in Kwiatkowski's margin account.

Schoenthal spoke repeatedly to Kwiatkowski throughout the day, informing him of market conditions in order to obtain Kwiatkowski's authorization either to defer or proceed with additional transactions. In Kwiatkowski's view, Schoenthal advised and managed the liquidation, while Kwiatkowski complied with his requests. Bear Stearns asserted, on the other hand, that although the position had to be liquidated, it sought Kwiatkowski's authorization at every turn before selling them. By early the next morning, March 6, all of Kwiatkowski's remaining foreign currency contracts had been liquidated, followed in the next two days by the equity held in his Security Accounts, leaving a balance still due to Bear Stearns of $2.7 million, which Kwiatkowski paid by March 9, 1995.

Kwiatkowski asserted that he was not informed while Bear Stearns was selling off his entire equities holdings, and that it was only days later that he realized what had occurred and the extent of his losses. Kwiatkowski maintained that the losses he suffered from his foreign currency trading from December 1994 to March 6, 1995 amounted to $215 million, of which $116 million was attributable to the transactions from March 1 through that final weekend of March 5.

In June 1996, Kwiatkowski filed this action against Bear Stearns and Sabini. The original complaint charged numerous violations of federal and New York state securities statutes and common law. On Bear Stearns's motions to dismiss for failure to state a claim and subsequently for summary judgment, Judge Koeltl, the judge to whom this case was assigned initially, ruled in favor of Bear Stearns in regards to all but two of Kwiatkowski's claims: breach of fiduciary duty and negligence.[5]

**5.** After Judge Koeltl, on August 29, 1997, granted in part Bear Stearns's motion to dismiss, Kwiatkowski filed a Second Amended Complaint in October 1998 repleading all claims. On November 29, 1999, the Court again, on Bear Stearns's motion for summary judgment, ruled in favor of Bear Stearns, reaffirming dismissal of the claims that previously had been dismissed, but denying sum-

During the course of a jury trial held in May 2000, Bear Stearns moved under Federal Rule of Civil Procedure 50(b), before and after Kwiatkowski's presentation of evidence, for judgment as a matter of law. The Court denied the motion without prejudice and submitted both claims to the jury. The jury returned a verdict in favor of Bear Stearns and Sabini on the breach of fiduciary duty claims. With regard to the negligence claim, the jury ruled in favor of Kwiatkowski and against the Bear Stearns entities jointly, awarding him $111.5 million, but not against Sabini.[6] Upon entry of judgment on June 1, 2000, Bear Stearns renewed its Fed.R.Civ.P. 50 motion and moved for a new trial under Fed.R.Civ.P. 59(a).

### RULE 50(b) AND RULE 59(a) STANDARDS

■■■ A judgment as a matter of law pursuant to Rule 50 is appropriate where "there is no legally sufficient evidentiary basis for a reasonable jury to find for a party." *Merrill Lynch Interfunding, Inc. v. Argenti*, 155 F.3d 113, 120 (2d Cir.1998). Such a determination may not be reached by evaluating the credibility of witnesses or the relative weight of evidence. Rather, in assessing a motion for judgment under Rule 50, the Court must view the evidence in the light most favorable to the non-movant. *See* 9 James Wm. Moore, et al., *Moore's Federal Practice* ¶ 50.64[1] (3d ed.2000); *see also Caruolo v. John Crane, Inc.*, 226 F.3d 46, 59 (2d Cir.2000). To grant a Rule 50 application, there must be " 'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or ... such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against [it].' " *Concerned Area Residents for Environment v. Southview Farm*, 34

F.3d 114, 117 (2d Cir.1994) (quoting *Song v. Ives Laboratories, Inc.*, 957 F.2d 1041, 1046 (2d Cir.1992)) (citations omitted).

■■■ The standard for granting a Rule 59 motion is less stringent. First, the trial judge may weigh the evidence himself and not view it in the light most favorable to the non-movant and, second, the motion may be granted even if substantial evidence may support the jury's verdict. *See DLC Mgt. Corp. v. Town of Hyde Park*, 163 F.3d 124 (2d Cir.1998). A Rule 59 motion for a new trial should be granted, however, only when the trial court is convinced that the verdict reached by a jury is "seriously erroneous" or the verdict is "a miscarriage of justice." *Katara v. D.E. Jones Commodities*, 835 F.2d 966, 970 (2d Cir.1987).

In the following discussion, the Court addresses the facts brought out at the trial in the context of its consideration of both motions together. Although the Court is to construe the evidence in the light most favorable to the non-movant for the purposes of a Rule 50 motion, and is to weigh the facts independently in deciding the Rule 59 motion, the Court finds that, as discussed below, under either standard, there is a legally sufficient basis for the jury's verdict. The Court also cannot conclude as a matter of law that the jury's determination is unreasonable or "seriously erroneous." *Id.*

### DISCUSSION

#### I. LAW OF THE CASE

The parties devote substantial argument to whether this Court, or Judge Koeltl addressed a basic issue disputed here. That question is whether, assuming Kwiatkowski's accounts at Bear Stearns were nondiscretionary, Bear Stearns owed Kwi-

mary judgment on the breach of fiduciary duty and negligence claims.

**6.** Judgment was entered in the amount of $111.5 million, plus prejudgment interest at

the rate of 9 percent as provided by sections 5001 and 5004 of New York's Civil Practice Law and Rules, calculated from March 6, 1995 through June 1, 2000.

atkowski a legal duty to furnish him with any investment advice. Bear Stearns contends that Judge Koeltl did not reach that question. In contrast, Kwiatkowski argues that when Judge Koeltl ruled that the evidence of negligence Kwiatkowski presented in opposing Bear Stearns's motion was sufficient to raise triable issues for the jury, the judge's determination did not rest on any misapprehension that Kwiatkowski's accounts were discretionary. Kwiatkowski further contends that Judge Koeltl's decision constitutes the law of the case.

■ Bear Stearns correctly points out that application of the law of the case doctrine is discretionary. *See In re PCH Assoc.,* 949 F.2d 585 (2d Cir.1991); *United States v. Birney,* 686 F.2d 102 (2d Cir. 1982). The rule is intended to ensure the orderly progression of litigation. It offers a measure of predictability to the conduct of the proceeding through its successive stages by not permitting the reopening of matters already decided. But the doctrine does not mandate that the Court adhere unquestioningly to its prior rulings, or to those of a judge who previously may have handled aspects of the case, if valid grounds exist to support a finding that any prior determination by the Court in the matter may have been erroneous. *See DiLaura v. Power Authority of New York,* 982 F.2d 73 (2d Cir.1992); *In re "Agent Orange" Prod. Liab. Litig.,* 733 F.2d 10, 13 (2d Cir.1984) (pretrial orders and rulings are subject to modification by the district judge at any time prior to final judgment and may be modified to the same extent if the case is reassigned to another judge).

■ Here, the Court informed the parties at the commencement of the trial that it would, to the extent applicable, consider pertinent rulings of Judge Koeltl as the law of the case and adhere to them in guiding the trial. In connection with the issue most intensely disputed in the instant motions, the Court stated:

> With regard to whether the plaintiff's account was discretionary or non-discretionary, the rulings indicate that the plaintiff does not dispute that the accounts were non-discretionary but that the relationship between the parties may have entailed the entrustment of duties even beyond the limitations of a non-discretionary account. That was what Judge Koeltl found most essential here.

Trial Transcript ("Tr.") at 5–6.

As this Court read the denial of Bear Stearns's motion for summary judgment, Judge Koeltl found that, even if Kwiatkowski's accounts were nondiscretionary, on the basis of the business relationship and course of dealings the record demonstrated he had established with Bear Stearns, there was sufficient evidence to raise a triable issue as to whether, in connection with Bear Stearns's handling of Kwiatkowski's investments, Kwiatkowski had entrusted matters and Bear Stearns had provided services that exceeded the bounds ordinarily associated with nondiscretionary accounts. *See* Tr. at 1212. Accordingly, as regards the negligence claim, the dispositive factual issue was not so much what type of accounts Kwiatkowski maintained, but rather the manner in which Bear Stearns actually dealt with them. Thus, in denying Bear Stearns's motion and sustaining the negligence claim, Judge Koeltl found issues of fact "as to whether the defendants *properly handled* the plaintiff's accounts, *including* whether the defendants *properly advised* the plaintiff with respect to his positions *and whether they liquidated his position in an appropriate manner." Kwiatkowski v. Bear, Stearns & Co., Inc.,* 96 Civ. 4798, 1999 WL 1277245, at *16 (S.D.N.Y. Nov.29, 1999) ("Kwiatkowski II") (emphasis added).

The operative conduct grounding Judge Koeltl's holding was the appropriateness of Bear Stearns's *handling* of Kwiatkowski's accounts. In this regard, he specified two examples. By use of the word "including", the judge suggests either that the alleged improper handling of Kwiatkowski's accounts may have been evidenced by the

two particular actions mentioned, or that the two examples may not have been exhaustive. Thus, as formulated by Judge Koeltl, the factual question found proper for the jury suggests one generic issue with perhaps at least two components, and not, as Bear Stearns contends, three distinct questions. *See* Defendants' Memorandum at 16.[7] In fact, the pleadings of negligence described in Kwiatkowski's Second Amended Complaint, and the claims placed at issue by the evidence at trial, assert generically a breach of the duty of reasonable care in Bear Stearns's dealings with Kwiatkowski, then specifying the related particular actions alleged to constitute the lack of due care. This reading was acknowledged by Judge Koeltl in his ruling sustaining the complaint. *See Kwiatkowski v. Bear, Stearns & Co., Inc.*, 96 Civ. 4798, 1997 WL 538819, at *6 (S.D.N.Y. Aug.29, 1997) ("Kwiatkowski I").

The elaboration included Bear Stearns's failing to make daily margin calls after February 14, 1995; failing to safeguard the Security Account he held for his children; waiting for weeks until Kwiatkowski's losses had reached the value of the securities accounts and then rapidly liquidating his positions in a deteriorating market; causing one-half of Kwiatkowski's foreign currency positions to be transferred to the OTC market; and engaging in transactions with Kwiatkowski on the OTC market as an interested party. *See Kwiatkowski II*, 1999 WL 1277245, at *15–16; Second Amended Compl., ¶¶ 62–66, 80. In either event, Judge Koeltl also made reference to "evidence of a substantial advisory function undertaken by the defendants" (*id.* at *13) and of a "substantial advisory relationship" in the course of which "the defendants were entrusted with matters and owed the plaintiff duties which exceed-

ed those of simply executing trades in a normal broker-client relationship in a non-discretionary account". *Id.* at *11.

Although these findings pertained specifically to Kwiatkowski's breach of fiduciary duty claim, Judge Koeltl's ruling regarding the negligence action makes clear he understood that there was some overlap among the relevant facts encompassed by the two theories of liability, and that to a large extent, they rested on the same actions and evidence. Consequently, in describing the negligence claim, Judge Koeltl noted that Kwiatkowski alleged that Bear Stearns owed him a duty to use reasonable and ordinary care in its dealings with him, "including the care and competence of a reasonable investment broker or advisor" and that Bear Stearns had breached that duty "*by the same actions the plaintiff alleges constituted a breach of the defendants' fiduciary duties.*" *Id.* at *15 (emphasis added). Similarly, in contrasting Kwiatkowski's negligence claim to the breach of contract claim the Court had dismissed, Judge Koeltl noted that the negligence action alleged that "the defendants violated duties of care they owed to the plaintiff as his broker and advisor and it is clearly broader than the dismissed claim for breach of contract." *Id.* at *16.

Accordingly, on this record, this Court concluded that the issues Judge Koeltl found were proper factual disputes supporting his denial of Bear Stearns's motion for summary judgment included the matter here in contention. This Court consequently adopted Judge Koeltl's rulings as the law of the case and submitted those issues to the jury. The central question is whether, as one among other aspects of Bear Stearns's dealings with Kwiatkowski and handling of his accounts, and as a component of a duty of reasonable care

---

7. In Bear Stearns's formulation, "Judge Koeltl set out the jury issues presented by plaintiff's negligence claim as follows: '[(1)] whether the defendants properly handled the plaintiff's accounts, including [(2)] whether the defendants properly advised the plaintiff with respect to his positions and [(3)] wheth-

er they liquidated his position in an appropriate manner.'" *Id.* Judge Koeltl's opinion does not contain the enumeration bracketed in this quotation, by which Bear Stearns suggests that the judge's finding of triable issues identified three discrete questions separately itemized, rather than interdependent issues.

under the circumstances, Bear Stearns's alleged failure to provide proper information and advice to Kwiatkowski constituted negligent conduct.

## II. *THE JURY INSTRUCTIONS*

As understood by this Court, and apparently by Judge Koeltl as well, Kwiatkowski's negligence claim rested on the theory that in Bear Stearns's overall handling of Kwiatkowski's accounts the firm failed to exercise the degree of skill and care a securities broker would reasonably employ under the circumstances. Even if Kwiatkowski's accounts at Bear Stearns were nondiscretionary, an issue of fact arose as to whether by their business dealings and course of conduct the parties had developed a relationship which entailed entrustment of matters and related performance by Bear Stearns of substantial advisory functions. The instructions the Court gave the jury in this regard reflect this understanding.[8]

In so charging, the Court summarized the contentions of both parties. It cited the instances and specific ways in which

Kwiatkowski alleged Bear Stearns had acted negligently. The Court set forth Kwiatkowski's claim that Bear Stearns owed him a duty to use reasonable and ordinary care in its dealings with him, including the care and competence of a reasonable investment or commodities broker.[9] The Court then set forth the countervailing responses Bear Stearns offered.[10]

The instructions informed the jury that "[a] defendant breaches a duty of care if his conduct is not that of a reasonably prudent person under similar circumstances." Tr. at 2285. In giving context to what the jury could take into account as some evidence of reasonable conduct related to a trade or business, the Court referred the jury to documents and to sharply divergent testimony of expert witnesses admitted in evidence regarding the applicability of certain general industry standards and practices, as well as Bear Stearns's own internal procedures. The Court permitted the jury, in reaching a verdict, to consider whether or not Bear Stearns adhered to these standards in handling Kwiatkowski's accounts.[11]

---

**8.** *See* Tr. at 2269–72; 2283.

**9.** Specifically, the Court described Kwiatkowski's contention that Bear Stearns "failed to provide him with analysis they had developed forecasting weakness in the value of the dollar in early 1995 and failed to advise him to close out his positions at a time when plaintiff contends the decreased equity in his account and the increased volatility of the market in the early part of 1995 threatened him with an alleged increased risk of loss. Plaintiff also claims the defendants were negligent in recommending investments plaintiff asserts were unsuitable for him. Specifically, Mr. de Kwiatkowski contends that the Bear Stearns defendants failed to disclose what he contends were significantly increased risks associated with plaintiff's large positions in late 1994 and the market liquidity problems he might encounter when trying to close positions of this large size. Plaintiff also contends that the defendants failed to determine, and to advise him whether this risk was reasonable under the circumstances the plaintiff asserts then prevailed." Tr. at 2284–85.

**10.** The Court's instruction stated: "The defendants argue that they properly advised plain-

tiff of the risks inherent in his investments. Defendants also contend that plaintiff was aware of this risk, as evidenced by the disclosure forms he signed when he opened his accounts with Bear Stearns and by paperwork received by him and his accountant, Mr. Themistocleous, and by the obvious nature of the risk of his positions. The defendants argue that they provided plaintiff with all the information that he requested about the strength of the dollar and were not obliged to provide the forecasts of particular Bear Stearns analysts. Defendants also contend plaintiff has not established that Bear Stearns did not provide him with any particular forecast or other information." Tr. at 2285.

**11.** In this connection, the Court instructed: "If, from the evidence presented in this case, you conclude that there are relevant general customs or practices in the business of investment and commodities brokers with respect to any of the matters in dispute here, you may take these general customs or practices into account in considering the degree of care exercised by defendants in this case. However, a general custom or practice by itself is not the only test. What you must decide is

The Court concluded by directing that the jury could find Bear Stearns negligent if it found that Kwiatkowski established that "defendants had a duty to perform particular services as brokers for plaintiff and failed, *in respect of their dealings with plaintiff*, to exercise the degree of care of a reasonably prudent and diligent broker under the same circumstances." Tr. at 2286 (emphasis added).

## III. CLAIMS OF ERROR

### A. Bear Stearns as Investment Advisor

■ Bear Stearns argues that the Court erred in its instructions to the jury by referring to Bear Stearns as "brokers and investment advisors", thereby allegedly misleading the jury into believing that Bear Stearns was obligated to provide investment advice to Kwiatkowski. *See* Defendants' Memorandum at 16. While conceding that the firm does provide investment advisor services to some of its clients, Bear Stearns asserts that Kwiatkowski was not one of them and that "that function had nothing to do with this case." *Id.* The Court disagrees.

As detailed below, and as Judge Koeltl had previously found as a triable issue, Bear Stearns's advisory function had much to do with this case, in the manner and to the extent, as developed at trial, that it arose out of the parties' relationship, conduct and course of dealings, if not strictly from contractual obligations. Nonetheless, the context in which the Court's instructions to the jury alluded to Bear Stearns as investment advisors makes unambiguously clear that the characterization was a general reference meant to describe the full range of financial services Bear Stearns provided to its various customers.

Whether or not the firm rendered investment advice to Kwiatkowski in particular was a central factual question in dis-

pute. Moreover, the issue of the extent of any advisory services Bear Stearns actually provided to Kwiatkowski related not only to Kwiatkowski's breach of fiduciary duty claim—the other theory of recovery that went to the jury—but to the negligence claim as well. As both the Second Amended Complaint and Judge Koeltl's rulings sustaining it make clear, Kwiatkowski's allegations of negligence are founded on essentially the same specific conduct as the breach of fiduciary duty claim.

In any event, the Court's charge to the jury stressed both that whether, in general, Bear Stearns provided investment advice at all depended upon the scope of the relationship and accounts established with its customers, and that, with regard to Kwiatkowski in particular, "[a] threshold issue about which the parties here differ, and which you as trier of facts must decide, is precisely which services, from among those they generally offered to their customers, defendants specifically provided to plaintiff in accordance with the particular relationship that existed between the parties." Tr. at 2269.

The Court then elaborated that the parties' relationship may be defined and evidenced in part by the services Bear Stearns undertook to provide Kwiatkowski, by the duties he entrusted to Bear Stearns pursuant to any agreements or understandings between them, as well as by the parties' conduct and practices. *See id.* Accordingly, the Court finds no reasonable basis for a determination that its reference to investment advisors in the instructions' factual description of Bear Stearns's business services to some of its customers could be reasonably construed as misleading, or that the mention as so qualified could have influenced the jury in any material way. Rather than prejudging or implying in any way that Bear Stearns had an obligation to offer Kwiat-

whether, taking all the facts and circumstances into account, the defendants acted

with reasonable care." Tr. at 2283–84.

kowski any advice or actually did so, the charge treated the issue as an open factual matter central to the parties' dispute and left it for the jury to decide.

### B. Theories of Negligence

Bear Stearns contends that the Court erroneously instructed the jury on Kwiatkowski's "four theories of negligence". This statement is inaccurate because its factual predicate is mistaken. In fact, the instructions articulated only one legal theory of liability for the jury to consider and apply in adjudicating the negligence claim: breach of the duty of reasonable care. Specifically, the jury was charged to decide whether Bear Stearns failed to exercise the degree of care expected of a reasonable or prudent broker acting under the same circumstances. Accordingly, what the Court conveyed to the jury was not four distinct statements of liability or standards of negligence, but one theory, a breach of a single legal duty—the obligation to exercise due care.

The statement of this conceptual basis for recovery was accompanied by the summary Kwiatkowski furnished alleging the particulars of his claim. This support itemized four specific ways and instances by which Kwiatkowski maintained Bear Stearns's conduct did not comport with the duty of reasonable care and therefore constituted negligence. In the same vein, the Court also set forth the assertions Bear Stearns offered to refute Kwiatkowski's allegations, thus squaring for the jury the factual dispute it was charged to resolve within its purview of assessing the credibility and weight of the evidence.

### C. Failure to Advise

Bear Stearns devotes the bulk of its challenge to the portions of Kwiatkowski's contentions which charge, as specific instances of negligence, that Bear Stearns failed to provide him certain warnings of risk, investment advice and pertinent analysis. This predominant focus on advice or materials allegedly provided or omitted overlooks altogether that at its theoretical core the basis of Kwiatkowski's negligence claim—as described in the Second Amended Complaint and by Judge Koeltl in denying Bear Stearns's motion for summary judgment, and as developed by the trial evidence—was not Bear Stearns's failure to provide advice per se. Rather, it comprised actions much more extensive, encompassing the alleged failure to provide information or advice as but an adjunct of Bear Stearns's dealings with Kwiatkowski and its handling of his accounts. It is this larger conduct that gives rise to the firm's duty under all the circumstances to use reasonable and ordinary care in its relationship with Kwiatkowski and that serves as the factual grounds for the jury's determination as to whether Bear Stearns "properly handled the plaintiff's accounts." *Kwiatkowski II*, 1999 WL 1277245, at *16.

Consequently, as this Court construed Judge Koeltl's rulings that found triable issues of fact, the matter of whether or not Bear Stearns owed Kwiatkowski a duty to warn or offer any information or advice, and whether or not any such duty was properly carried out, did not constitute a free-standing legal theory of liability, but one component of the larger question that incorporated other factual issues in dispute.

Consistent with this understanding, the jury's instructions did not express the alleged particular instances of failure to warn or advise as independent obligations constituting the duty of care. Instead, the Court charged that the duty to use reasonable care that Kwiatkowski claimed Bear Stearns owed him, "including the care and competence of a reasonable investment or commodities broker," was grounded "in their dealings with him." Tr. at 2283. The referenced "dealings" extended beyond rendering or failing to render advice. The term also encompassed, as Kwiatkowski's Second Amended Complaint charged and Judge Koeltl found as a triable issue, whether Bear Stearns "liquidated [Kwiatkowski's] position in an appropriate man-

ner". *Kwiatkowski II*, 1999 WL 1277245, at *15.

Moreover, in opening and closing arguments, Kwiatkowski's counsel described Kwiatkowski's theory of recovery and outlined other conduct that did not entail providing advice as such, but that he maintained further demonstrated Bear Stearns's alleged breach of due care in the firm's "dealings" with Kwiatkowski and his accounts. *See* Tr. at 44–67; 2195–2225. These actions involved initially placing Kwiatkowski's unusually large position in the wrong currency market; lacking sufficient knowledge and professional skill to handle Kwiatkowski's 1994 foreign currency position and failing to seek assistance from Bear Stearns's own foreign currency experts; failing to comply with industry practices and internal guidelines by not performing appropriate risk analysis of Kwiatkowski's materially different investment position as market conditions and the status of his accounts changed; neglecting to supervise and monitor properly the handling of Kwiatkowski's accounts; failing to provide Kwiatkowski with Bear Stearns's negative forecasts for the dollar after having supplied him with its earlier bullish report; offering what may be characterized as unwarranted, optimistic assurances or encouraging a false sense of security that Kwiatkowski claimed he relied upon in maintaining his large currency futures position longer than may have been prudent; and charging excessive markups and commissions. *See id.* These issues, as further discussed below, occupied a substantial portion of the trial. They raised vigorously contested factual disputes among the parties and their experts, and constituted fair grounds for resolution of the conflicting evidence by the jury in the exercise of its proper role.

Nonetheless, Bear Stearns not only asserts that it had no legal duty to offer advice but denies having done so in this case, other than perhaps incidentally. The record, however, belies this contention. Judge Koeltl found, and the trial record

sustained, that during the course of the parties' business relationship and dealings, and in particular in connection with the crucial events of late 1994 and early 1995 relating to the acquisition and liquidation of Kwiatkowski's foreign currency position, a jury reasonably could have concluded that Bear Stearns actually undertook to provide Kwiatkowski with "substantial advice with respect to the size, placement, and timing of his transactions". *Kwiatkowski II*, 1999 WL 1277245, at *12. This evidence is summarized in Part V, B, *infra*.

### D. *Absence of Duty*

Bear Stearns's principal challenge asserts that, in the instructions pertaining to the negligence claim, the Court outlined for the jury Kwiatkowski's "four theories" of negligence grounded on Bear Stearns's failure to advise him and *"left it for the jury to determine whether defendants had a duty to provide that advice"*. Defendants' Memorandum at 4 (emphasis in original). According to Bear Stearns, the issue as to whether the firm was obligated to provide any investment advice should have been resolved by the Court before the case was sent to the jury. Consequently, Bear Stearns maintains that if the Court had performed that inquiry properly, Kwiatkowski's negligence claim would never have been submitted to the jury in the first place. On this theory, the Court should have decided as a matter of law that Bear Stearns owed Kwiatkowski no legal duty to render advice of any kind since his accounts were nondiscretionary.

In support of its contention, Bear Stearns argues that there is no authority under any applicable statute, case law, rule or regulation under which a broker could be held to a legal duty to provide investment advice to a customer of a nondiscretionary account, and that none of the agreements Bear Stearns entered into relating to Kwiatkowski's foreign currency trading account contains any terms or conditions requiring Bear Stearns to render

investment advice to Kwiatkowski. *See id.* at 6–10.[12]

Bear Stearns's reasoning is thus tantamount to a per se defense that in relation to a holder of a nondiscretionary account a broker's limited duties to the customer not only exclude any obligation to offer advice, but may not even embrace a duty of ordinary, reasonable care. *See id.* (citing *Richardson Greenshields Sec., Inc. v. Mui-Hin Lau,* 693 F.Supp. 1445, 1457 (S.D.N.Y.1988) (declining "to create [a duty of care] for commodities dealers under these circumstances")). In practice, this proposition would require that the classification of a customer's account would end the inquiry concerning the extent of a broker's duties to the client. The existence of a nondiscretionary account would be categorically dispositive, and there would be no need to examine any further circumstances.

## IV. APPLICABLE LEGAL PRINCIPLES

Bear Stearns's hypothesis raises a number of fundamental issues implicating basic aspects of contract, agency and tort law. The Court finds that conceptually Bear Stearns's arguments are not properly premised and reflect a reading of the law that is too limited. Central to a full response to Bear Stearns's theory is a proper understanding of the interplay among the various legal principles the parties' propositions here invoke, including contract doctrine, the broker/customer relationship and corresponding duties, as well as of the scope of the duty of care applicable in this context. To adequately address the various elements of the legal questions presented by the motions before the Court, an overview of these relationship/duties issues is essential.

### A. Bases for the Broker's Duties

■■ The relationship and associated duties corresponding to the type of broker/customer account are matters generally determined by the terms of the parties' agreements. *See Northeast General Corp. v. Wellington Advertising, Inc.,* 82 N.Y.2d 158, 604 N.Y.S.2d 1, 624 N.E.2d 129, 130 (1993) ("Courts look to the parties' agreements to discover, not generate, the nexus of relationship and the particular contractual expression establishing the parties' interdependency."); *see also Mobil Oil Corp. v. Joshi,* 202 A.D.2d 318, 609 N.Y.S.2d 214, 215 (1st Dep't 1994). Consequently, issues pertaining to the *existence* and scope of the relationship and duties are usually settled by reference to principles of contract law. *See Northeast General,* 604 N.Y.S.2d 1, 624 N.E.2d at 131–32. As regards a nondiscretionary account, the customer retains management and control over investment transactions, determining what purchases and sales to make. *See Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 461 F.Supp. 951, 952 (E.D.Mich.1978), *aff'd,* 647 F.2d 165 (6th Cir.1981) (table). For the purposes of assessing the broker's role and ascribing attendant legal duties, each transaction is considered separately. *Id.* In this regard, the broker's basic duties, as recognized by the courts, may be classified broadly in two categories.

■ One set of obligations requires conduct that demands and promotes diligence and skill. These duties obligate the broker to study a security sufficiently before recommending it (*see Hanly v. S.E.C.,* 415 F.2d 589, 596 (2d Cir.1969); *C.F.T.C. v. J.S. Love and Assocs. Options Ltd.,* 422 F.Supp. 652, 660 (S.D.N.Y.1976)); to be-

---

**12.** Bear Stearns identifies four documents as containing the relevant terms describing the parties' relationship, including Bear Stearns's warnings of the risks attendant to Kwiatkowski's foreign currency trading account, three of which are dated January 16, 1991:(1) the Commodity Futures Customer Agreement and attached risk disclosure statement; (2) the Customer Agreement; and (3) the Options on Futures Risk Disclosure Statement and Customer Agreement. The fourth, the Foreign Exchange Agreement, is dated January 19, 1995. *See id.* at 7 n. 3.

come familiar with an issuer's financial soundness and performance potential and inform the customer of all material information so acquired (*see Hanly*, 415 F.2d at 596); and to execute the customer's requested purchase and sales orders promptly and faithfully, in this regard informing the customer of known risks associated with the particular investment and transmitting records of all transactions. *See Richardson v. Shaw*, 209 U.S. 365, 28 S.Ct. 512, 52 L.Ed. 835 (1908) (applying New York law); *Hanly*, 415 F.2d at 595–96.

Another class of duties requires the integrity and good faith of the broker in handling the customer's account. To this end, the broker is obligated to refrain from self-dealing and to disclose any conflicting or personal interest the broker may have in the transaction (*see Chasins v. Smith Barney & Co.*, 438 F.2d 1167, 1172 (2d Cir.1970)); not to withhold or misrepresent material information relevant to the investment; and not to engage in transactions without giving the client prior notice and obtaining authorization. *See Independent Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 940–41 (2d Cir.1998); *Leib*, 461 F.Supp. at 952 and cases cited therein; *see also Bissell v. Merrill Lynch & Co., Inc.*, 937 F.Supp. 237, 247 (S.D.N.Y.1996).

■ The manner and degree in which the broker may properly fulfill these responsibilities in any given case may vary, depending to some extent upon the business sophistication of the client and the nature of the relationship between the parties. In the ordinary situation, the broker's professional obligation to the customer with respect to any particular investment ends upon the completion of the authorized transaction. *See Leib*, 461 F.Supp. at 953; *see also Caravan Mobile*

*Home Sales, Inc. v. Lehman Bros. Kuhn Loeb, Inc.*, 769 F.2d 561, 567 (9th Cir. 1985); *Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 337 F.Supp. 107, 111 (N.D.Ala.1971), *aff'd*, 453 F.2d 417 (5th Cir.1972).

### 1. *The Broker as Agent*

■ Under Bear Stearns's theory, solely by virtue of Kwiatkowski's nondiscretionary accounts, the firm's business relationship with Kwiatkowski was merely that of a broker, and its corresponding duties to him therefore were confined to those described by the parties' contractual obligations and any applicable principles from the law of agency. Viewed in its narrowest terms, the broker's role ordinarily is mechanical and ministerial: to fulfill the limited transactional requirements of the client's securities purchase or sale orders.[13] One court expressed the strict confines of the duties:

> A broker's office, without special circumstances … is simply to buy and sell. The office commences when the order is placed and ends when the transaction is complete. The risk of the venture is upon the customer who profits if it succeeds and loses if it fails.... The affair entrusted to a broker who is to buy or sell through an exchange is to execute the order, not to discuss its wisdom.

*Robinson*, 337 F.Supp. at 111.

Following this formulation, absent a special relationship of trust and confidence or an express contract between broker and client, "the broker has no duty to relay news of political, economic, weather or price changes to his principal …." *Id.* at 112. *See also Caravan*, 769 F.2d at 567 ("The stockbroker assumes no continuing obligation to advise his clients of informa-

---

13. Bear Stearns's expert witness, Nicholas J. Weir ("Weir"), described the service of commodities brokers on a nondiscretionary account as follows: "They will be on the phone. They will get an order from the customer. They will write the order down. They take it to the wire room. The wire room transmits it

to the floor. The order is executed. It comes back to the broker. The broker then calls the customer and reports the trade back to the customer, and the broker is providing information and insight to the extent they have it into the market and providing opinions and so forth." Tr. at 1867.

tion that affects their securities"); *Leib,* 461 F.Supp. at 953 ("A broker has no continuing duty to keep abreast of financial information which may affect his customer's portfolio or to inform his customer of developments which could influence his investments. Although a good broker may choose to perform these services for his customers, he is under no legal obligation to do so.").

Bear Stearns relies on these principles to argue, in essence, that there is nothing more to the case before the Court than the nature of Kwiatkowski's accounts. But, if in fact a mere recitation of bare legal maxims were all there was to this matter, the action would present only an easy, garden-variety dispute. Its resolution would be a "slam dunk" for the broker here, and this Court would not have encountered any vexing conceptual struggles in deciding Bear Stearns's post-trial motions.

Absent from a stark citation of rudimentary legal doctrine is the context that distinguishes the case, the factual texture that uniquely determines whether the precepts and precedents the parties' black letter battles rely upon are truly pertinent here. In fact, the very cases from which Bear Stearns quotes extensively for its statement of settled law supply the missing substance that bare enunciation of basic canons obscures. *Robinson,* for instance, qualifies its statement of the broker's duties to the customer with a pertinent extenuation: *"without special circumstances not present here ...."* *Robinson,* 337 F.Supp. at 111 (emphasis added).

Other articulations of the standard obligations of the broker similarly preface the statement of the general rule with some caveat signaling that its application extends to the "normal" or ordinary course of business, and that "special circumstances" may arise case-by-case that may exempt the particular action from the scope of the general standard. *See Scott v. Dime Savings Bank, FSB,* 886 F.Supp.

1073, 1078 (S.D.N.Y.1995), *aff'd,* 101 F.3d 107 (2d Cir.1996), *cert. denied,* 520 U.S. 1122, 117 S.Ct. 1260, 137 L.Ed.2d 339 (1997) (finding evidence on the record that the relationship between a bank and a borrower was not the "usual relationship" but one that under "special circumstances" gave rise to fiduciary duties); *See also Caravan,* 769 F.2d at 567 (*"Normally* the agency relationship created by a non-discretionary account arises when the client places an order and terminates when the transaction ordered is complete") (emphasis added); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng,* 697 F.Supp. 1224, 1226–27 (D.D.C.1988) (distinguishing *Caravan* based on the different facts in the cases).

Consistent with a more agile, multi-dimensional aspect of the law, even the most elementary declaration of a broker's responsibilities under agency doctrine governing the principal/agent relationship recognizes qualifications that serve to circumscribe the bounds of the general rule at the outer edges of real experience where exceptional circumstances may prevail. Section 381 of the *Restatement (Second) of Agency,* for example, provides:

> Unless otherwise agreed, an agent is subject to a duty to use reasonable efforts to give his principal information which is relevant to affairs entrusted to him and which, as the agent has notice, the principal would desire to have ....

*Restatement (Second) of Agency* § 381 (1957); *accord Conway v. Icahn & Co.,* 16 F.3d 504, 510 (2d Cir.1994).

In the accompanying comment, the *Restatement* elaborates that "[i]n cases of this sort, the duty of the agent is inferred from his position, just as an authority is inferred. The extent of the duty depends upon the kind of work entrusted to him, his previous relations with the principal, *and all the facts of the situation." Id.* (emphasis added).

The contextual qualifiers these cases and authorities articulate to condition the

applicability of the general rule instruct that the law is neither so mechanical, rigid or deterministic, as the arguments here advanced would hold, as to be guided resolutely by labels placed on accounts without reckoning for the extraordinary event, or to command procrustean resolution of the exception by means of rules framed primarily for the commonplace. Of course, the law, as it should, must remain more or less referenced to fixed points in order to lend predictability and guide conduct that truly fits the patterns of comparable and ordinary events.

But, as a mirror of life, the spirit of the law is also adaptive. It reflects shades and contours that vary so as to accommodate, in addition to the generalized, the shapes and shadows of the exceptional moment. While the measure of a standard of conduct must remain objective, the rule that gauges what may be deemed acceptable at a given time and place may modulate to reflect the forces and realities that mold external events. *See Wagner v. International Ry. Co.*, 232 N.Y. 176, 133 N.E. 437, 438 (1921) (Cardozo, J.) ("The reason that was exacted of [plaintiff in an emergency] was not the reason of the morrow. It was reason fitted and proportioned to the time and the event.").

## 2. *The Broker As Fiduciary*

Precisely how far may extend the agent's duties that derive from "previous relations" with the principal and "all the facts of the situation," as referred to in the *Restatement (Second) of Agency*, is often blurry in broker-client cases. This uncertainty results because in many jurisdictions, including New York, the broker/client relationship may be said to be "fiduciary in nature." *See Conway*, 16 F.3d at 509; *Kwiatkowski II*, 1999 WL 1277245, at *9; *cf. Bissell*, 937 F.Supp. at 246 ("the mere existence of a broker-customer relationship is not proof of its fiduciary character"). From this quality follows that certain duties deemed fiduciary may be associated with the broker's obli-

gation to the client. These obligations may arise from and be defined by agreements, by course of conduct or business dealings reflecting matters entrusted to the broker, or by laws that specifically govern the relationship. *See generally Conway*, 16 F.3d at 510; *Kwiatkowski II*, 1999 WL 1277245, at *9; *Cauble v. Mabon Nugent & Co.*, 594 F.Supp. 985, 989 (S.D.N.Y.1984).

In general, the fiduciary duties identified with the broker/client relationship are designed to protect the customer from deception and unfair advantage and to promote professional skill and due diligence. Because breach of a fiduciary duty is an intentional tort, it requires an element of deceitful intent or recklessness ordinarily associated with more aggravated conduct. *See Flickinger v. Harold C. Brown & Co., Inc.*, 947 F.2d 595, 599 (2d Cir.1991); *Kwiatkowski I*, 1997 WL 538819, at *5. Consequently, the scope of fiduciary liability is narrowed to acts more directly targeted to or affecting the customer or his account.

At bottom, the stated duties protect a relationship typically already pre-existing and generally defined by the parties' manifested intent in contractual agreements, course of conduct or previous business dealings. The wrong in a breach of fiduciary action is the failure to perform the particular duty imposed by the relation, thus constituting an offense to the relationship itself. *See Restatement (Second) of Torts* § 874 (1977). For these reasons, the particular scope of duties corresponding to the fiduciary relationship are susceptible to being limited to predetermined tasks fixed by agreement, course of dealings or legal rules, and thus to being more readily ascertainable. *See Hill v. Bache Halsey Stuart Shields Inc.*, 790 F.2d 817, 824–25 (10th Cir.1986); *cf. Wiener v. Lazard Freres & Co.*, 241 A.D.2d 114, 672 N.Y.S.2d 8, 16 (1st Dep't 1998) (courts typically consider the nature of ongoing conduct between parties outside of any written contract before reaching conclu-

sions as to whether a fiduciary relationship exists where the parties failed to provide for it in their written agreements).

### 3. The Duty of Due Care

■ The duty of reasonable care, on the other hand, by its nature is both more expansive and more imprecise. Unlike contractual or fiduciary obligations, the duty of due care arises not by agreements or imposition of the parties governing their relations, but by operation of law. The duty emerges out of a totality of given circumstances and holds the defendant in an action to a standard of conduct designed to protect persons located within a reasonable zone of foreseeability who were injured by a defendant's careless behavior. *See Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 467 (2d Cir.1995); *Kush v. City of Buffalo*, 59 N.Y.2d 26, 462 N.Y.S.2d 831, 449 N.E.2d 725, 727 (1983); *Nallan v. Helmsley–Spear, Inc.*, 50 N.Y.2d 507, 429 N.Y.S.2d 606, 407 N.E.2d 451, 458–59 (1980); *Basso v. Miller*, 40 N.Y.2d 233, 386 N.Y.S.2d 564, 352 N.E.2d 868, 872 (1976); *Koppel v. Hebrew Academy of Five Towns*, 191 A.D.2d 415, 594 N.Y.S.2d 310, 311 (2d Dep't), *leave to appeal denied*, 82 N.Y.2d 652, 601 N.Y.S.2d 582, 619 N.E.2d 660 (1993). *See also Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540, 583 N.Y.S.2d 957, 593 N.E.2d 1365 (1992); W. Page Keeton, et al., *Prosser and Keeton on Torts* § 43 at 285–88 (5th ed.1984) (hereinafter "Prosser"); *Restatement (Second) of Torts* § 4. To this extent, a negligence claim is necessarily broader than the action for breach of fiduciary duty.

### 4. Negligence and Contract

Under negligence principles, the relationship between plaintiff and defendant that gives rise to the associated duty of care may preexist. But it also may not exist at all, or may arise only by imposition of law out of what the particular circumstances may demand for the protection of all persons from injury caused by another person's failure to exercise due care.

■ The law prescribes the obligation of due care based on policy considerations unrelated to any contractual obligations binding particular parties. *See Hamilton v. Beretta U.S.A. Corp.*, 222 F.3d 36, 41–42 (2d Cir.2000); *McCarthy v. Olin Corp.*, 119 F.3d 148, 166 (2d Cir.1997); *Glanzer v. Shepard*, 233 N.Y. 236, 135 N.E. 275 (1922); *MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 111 N.E. 1050 (1916); *Fish v. Waverly Electric Light & Power Co.*, 189 N.Y. 336, 82 N.E. 150 (1907); *see also Palka v. Servicemaster Mgt. Servs. Corp.*, 83 N.Y.2d 579, 611 N.Y.S.2d 817, 634 N.E.2d 189, 193 (N.Y.1994) ("Not uncommonly, parties outside a contract are permitted to sue for tort damages arising out of negligently performed or omitted contractual duties."); *Prosser* § 92 at 655 (tort obligations are "imposed apart from and independent of promises made and therefore apart from any manifested intention of parties to a contract or other bargaining transaction"). Consequently, contractual commitments cannot serve to excuse carelessness or shield a defendant from liability for injury that a breach of the duty of due care may engender. *See Restatement (Second) of Torts* § 4c.[14]

■ Implicit in these principles is that to achieve the protective ends of the more expansive scope of the duty of care, especially in unique situations, the reach of potential liability for breach of that duty may encompass acts or omissions that cannot always be either specifically predetermined nor pre-excluded. Given special

---

**14.** On this point, the Restatement elaborates: "The duty in contract is normally to do or refrain from doing a particular or definite thing irrespective of the end which is to be served. . . . On the other hand, the duty in tort is only occasionally to do or refrain from doing a particular thing, and even then the doing or non-doing of the thing is not the end purpose of the duty itself. . . . In addition, *the actor's duty in tort is often to be determined ex post facto by the jury in their determination as to whether the actor has or has not used reasonable care.*" *Id.* (emphasis added).

factors, obligations that by the parties' manifest intent may be excluded by commitments of contracts or fiduciary duties may be deemed to be encompassed by breach of the duty to exercise reasonable care in light of the circumstances. The pertinent legal obligation then extends not to precisely defined and catalogued, preexisting tasks, but to the exercise of due care demanded by given conditions in order to avoid injury to others, in other words, what is actually done or not done by a defendant that was either called for or not under all the circumstances.

### 5. Negligence and Breach of Fiduciary Duty

These standards are often blurred and confused because in many broker/client cases, as in the action at bar, a customer alleging negligence on the part of the broker typically also asserts breach of a fiduciary duty claim that may arise out of much of the same conduct and events on which the negligence charge is grounded. As witnessed in the instant case, the broker may be found liable on one claim even if not on the other. *See e.g., Conway,* 16 F.3d at 511 (plaintiff sought and the jury awarded identical amounts of damages separately on claims of breach of fiduciary duty and negligence; upholding the trial court's limiting the recovery to one claim, the Circuit Court noted that "[plaintiff's] theories of recovery were based on a single set of facts, and the economic loss sustained was predicated on those unitary facts"); *Quick & Reilly, Inc. v. Walker,* 930 F.2d 29, 1991 WL 42938, *2 (9th Cir. 1991) (table) ("The trial court judge directed a verdict on the fraud claims but allowed Walker's negligence claim, based on essentially the same conduct, to go to the jury. The court regarded Walker's evidence as sufficient to establish a lack of due care, but not sufficient to establish either misrepresentation or other misconduct, or negligence so egregious as to constitute recklessness."); *see also Vucinich v. Paine, Webber, Jackson & Curtis, Inc.,* 803 F.2d 454 (9th Cir.1986); *Scott,* 886

F.Supp. 1073; *Fustok v. Conticommodity Servs., Inc.,* 618 F.Supp. 1082, 1085 (S.D.N.Y.1985) ("Fustok could still maintain an action for breach of fiduciary duty based upon the principal/agent status which the common law applies to a broker/customer relationship. Of course, the same basic concepts, e.g., the existence of a duty and a breach of that duty ... will support a substantive tort claim for negligence."); *Cheng,* 697 F.Supp. at 1227.

The conflation of these issues is relevant to the matter at hand because Bear Stearns argues that because the jury found for it on Kwiatkowski's breach of fiduciary duty claim, the cases dealing with breach of fiduciary duty have no bearing here, and impliedly that there was thus no other duty at issue which the jury should have been allowed to consider. *See* Defendants' Reply Memorandum in Support of Motion for Judgment as a Matter of Law and, in the Alternative, for a New Trial, dated July 12, 2000 ("Defendants' Reply Memorandum"), at 3. But, as the foregoing cases illustrate, while there may be some overlap between the claims and elements of breach of fiduciary duty and negligence, the two actions do not negate one another and may be grounded—some or all—on the same or similar acts or omissions of the broker. *See Conway,* 16 F.3d at 511; *see also Thropp v. Bache Halsey Stuart Shields, Inc.,* 650 F.2d 817, 820 (6th Cir. 1981) ("An agent's negligence may give rise to a breach of fiduciary duty."). *See generally,* 4 Stuart M. Speiser, et al., *The American Law of Torts* § 15.125 (1987).

The interaction and common element between the two theories of liability reside in the prevailing special circumstances. In regards to breach of fiduciary duty claims, exceptional conditions and events may be deemed by the courts to justify the imposition of particular fiduciary duties, even where no express intent may be manifest between the parties, or indeed where the broker vigorously denies the existence of any fiduciary relationship. *See Conway,*

16 F.3d at 509; *Vucinich,* 803 F.2d at 460; *Scott,* 886 F.Supp. at 1077; *Fustok,* 618 F.Supp. at 1089. By the same token, on a theory of negligence, extraordinary events may support imposition of a duty of reasonable care arising from aspects of the same conduct on the part of the broker. Accordingly, this authority may be read to hold generally that whether or not a customer's account is nondiscretionary, and whether or not the broker's actions constituted a breach of fiduciary duty, a securities or commodities broker's dealings with the customer and handling of his account may be held to a standard of care and professional skill of a reasonable broker under the circumstances.

To summarize, "special circumstances" may be read as the law's shorthand, code words that signify concepts developed of necessity in order to achieve equitable ends and values that serve the larger ends of the community. The element represents a means for codifying a measure of flexibility in applying rules of conduct to exceptional events. As a point of departure, the doctrine reflects that in settling questions of liability, narrower obligations which derive from the contractual or fiduciary relations between particular parties may be superseded or augmented by larger duties imposed by law to serve the interests not only of the litigants, but of the broader community in the administration of justice.

Accordingly, when Bear Stearns invokes the existence of its customer's nondiscretionary accounts as a demarcation of the duties it owed Kwiatkowski, it is speaking in terms of contract, addressing the issues here relevant from the limiting plane of general consensual standards governing some aspects of the firm's relationship with Kwiatkowski. However, onto the self-prescribed rules that particular parties adopt by mutual agreement to settle duties and expectations as between them, the duty of reasonable care overlays a distinct dimension designed to protect larger societal interests and ends that may extend beyond those of particular litigants. And so, even if Bear Stearns, in accordance with Kwiatkowski's nondiscretionary accounts, may not have been contractually obligated to provide the specific investment advice here in contention, under appropriate circumstances the firm's failure to provide its customer the best information it had available—within the scope of the parties' relationship, the affairs entrusted and the importance of the material to the customer—could give rise to a breach of the duty of reasonable care.

### 6. *Standards of Due Care*

■ The foregoing discussion does not imply, however, that the duty of care is to be applied in a vacuum, without some articulated norms by which the jury could measure whether or not the broker satisfied the standard. In fact, a number of considerations have been identified by courts as sources of guidance applicable to an evaluation of a broker's duty of due care, several of which are pertinent to the case at hand and reflect factors placed before the jury by the evidence at trial and by the Court's instructions.

These include: (1) failure to adhere to industry standards and practices or internal procedures (*see Scott,* 886 F.Supp. at 1080–81; *Cheng,* 697 F.Supp. at 1227; *Fustok,* 618 F.Supp. at 1086; *Miller v. Smith Barney, Harris Upham & Co.,* 84 Civ. 4307, 1986 WL 2762 (S.D.N.Y. Feb.27, 1986); *Siedman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 465 F.Supp. 1233, 1236 (S.D.N.Y.1979); *Trimarco v. Klein,* 56 N.Y.2d 98, 451 N.Y.S.2d 52, 436 N.E.2d 502 (1982); *see also Sears, Roebuck & Co. v. Enco Assocs., Inc.,* 43 N.Y.2d 389, 401 N.Y.S.2d 767, 372 N.E.2d 555 (1977); *AJ Contracting Co., Inc. v. Trident Managers, Inc.,* 234 A.D.2d 195, 651 N.Y.S.2d 498 (1st Dep't 1996)); (2) failure to supervise adequately the broker's activities in handling the client's account (*see Levitin v. Paine-Webber, Inc.,* 159 F.3d 698, 705 n. 10 (2d Cir.1998), *cert. denied,* 525 U.S. 1144, 119 S.Ct. 1039, 143 L.Ed.2d 47 (1999); *Vuci-*

*nich,* 803 F.2d at 460; *Miller,* 1986 WL 2762, at *5); (3) failure to give notice and exercise sound or reasonable judgment in carrying out the customer's instructions and handling the account (*see Conway,* 16 F.3d at 510; *Cauble,* 594 F.Supp. at 992); (4) making unfounded representations that may induce reliance or a false sense of security (*see Walker,* 930 F.2d 29, 1991 WL 42938, at *2; *Granite Partners v. Bear Stearns & Co., Inc.,* 17 F.Supp.2d 275, 288 (S.D.N.Y.1998)); and (5) failure to possess a degree of competent skill to perform duties the broker undertakes. *See Thropp,* 650 F.2d 817.

### 7. *Policy Considerations for Fiduciary/Due Care Duty Distinction*

 Central to these standards is an underlying policy that Bear Stearns's theory here puts into play. It is that a securities customer is entitled to demand of the broker not only utmost probity, but also competence, both fair dealing and due care. These norms represent distinct ends and values. As the morality of the marketplace cannot be the measure of the broker's integrity, so too the standard of care by which the broker's conduct is judged and held accountable must reflect the needs and realities appropriate for the marketplace and the particular circumstances. The community's mark of acceptable performance for any broker should not be lowered so as to prescribe the norm of the honest incompetent. Underscoring this principle is the reality that a customer may be subject to financial ruin as much by a broker's carelessness as by his theft or fraud.

 Thus, as the Court charged the jury in this case, although an action for breach of fiduciary duty requires an element of fraudulent intent, a broker who by a course of particular conduct does not evince any deliberate purpose to steal from or deceive a client may nonetheless, by means of the same acts or omissions, perform his services wrongfully and cause injury by exhibiting less than due care. It

therefore does not follow, as the logical extension of the contrary argument would imply, that it is enough to absolve a broker from liability for conduct harmful to the customer that in performing his limited, agreed-upon tasks the broker had no fraudulent or criminal design. *See Fustok,* 618 F.Supp. at 1085.

### B. *Evolution and Application of Due Care Principles*

From time immemorial, human history and common experience, as evidenced by whole libraries of case books, attest that different people, though similarly bound in some relationship and challenged to the same degree to decide whether and when to act to avert or lessen injury to others, nonetheless choose differently. Some elect, even at potential risk to others, to do nothing and let the person who assumed the risk perish. Others move promptly to protect only their own interests. Yet another group would take steps to render assistance or minimize the threat. Many combinations of these responses also abound.

Out of the multiple choices that special situations uniquely present to those who must choose, norms of acceptable behavior have emerged. Generally it is not at the depths of mainstream experience, but at the edges of the unusual where the front line carves out and defines new ground, that the community perfects its concept of justice, refining its sense of right and wrong and describing the conditions under which one person may derive reasonable expectations of protection from harm, while on others, the law imposes legal obligations to respond to particular circumstances in a reasonable manner to avert or mitigate injury.

This process portrays the evolution of rules defining the duty of due care. The scope and application of these rules over time offer useful analogies, and precedents from which guidance may be drawn in addressing the issues now before the Court. The central principle unifying the

development of the standard, as culled from case law, is that the duty of every person to exercise reasonable care for the protection of others from harm may arise out of the uniqueness of the circumstances, and the response demanded may be engendered by the events.

■ One situation that may give rise to a duty, where none may have existed before, to act and to exercise reasonable care in doing so, entails a person's assumption, by promise or partial performance, of certain responsibilities under certain conditions. Thus, while generally a person may be under no obligation to render aid to another in a situation of danger, even absent a recognized relationship between the parties, if a rescuer does undertake to provide assistance and does not exercise reasonable care, or makes matters worse for the injured party, or gives a promise to perform a service that another relies upon to his detriment, the law imposes a basis for liability for any injury that may be proximately caused by the failure to respond with due care under the circumstances. *See Alfaro v. Wal–Mart Stores, Inc.,* 210 F.3d 111, 113–14 (2d Cir.2000); *Devlin v. Safeway Stores,* 235 F.Supp. 882 (S.D.N.Y.1964); *Parvi v. City of Kingston,* 41 N.Y.2d 553, 394 N.Y.S.2d 161, 362 N.E.2d 960 (1977); *Marks v. Nambil Realty Co.,* 245 N.Y. 256, 157 N.E. 129 (1927); *O'Leary v. Erie R.R. Co.,* 169 N.Y. 289, 62 N.E. 346 (1901); *Zelenko v. Gimbel Bros.,* 158 Misc. 904, 287 N.Y.S. 134 (1935), *aff'd,* 247 A.D. 867, 287 N.Y.S. 136 (1st Dep't 1936); *see also Prosser* § 56 at 378 ("if the defendant does attempt to aid [the plaintiff], and takes charge and control of the situation, he is regarded as entering voluntarily into a relation which is attended with responsibility.... Such a defendant will then be liable for a failure to use reasonable care for the protection of the plaintiff's interests."). The obligation to render reasonable assistance or avoid further injury may rise to an affirmative duty in the

context of certain relationships. *See Prosser* § 56 at 378.[15]

■ Broadly stated, the principle these cases suggest is that, in particular situations, the duty of reasonable care may encompass particular acts or omissions, reasonably proper to the situation, that under normal conditions may not have been required, or that ordinarily there may have been no contractual mandate to perform, or even that a given relationship otherwise did not contemplate.

■ Less definitive than the existence of a duty of care in exceptional circumstances is precisely what conduct the duty would demand. According to Professor Prosser, "[j]ust when the duty is undertaken, when it ends, and what conduct is required, are nowhere clearly defined, and perhaps cannot be." *See id.* at 378. However, where performance clearly has been begun, there is no doubt that a duty of care arises obligating the defendant to take reasonable measures to prevent the risk of injury. *See, e.g., Indian Towing Co. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955); *Yates v. United States,* 497 F.2d 878 (10th Cir.1974); *Parvi,* 394 N.Y.S.2d 161, 362 N.E.2d at 964 ("The case law is clear that even when no original duty is owed to the plaintiff to undertake affirmative action, once it is voluntarily undertaken it must be performed with due care."); *Marks,* 157 N.E. at 129–30.

While the foregoing discussion outlines concepts of general application, relevant New York law accords with the doctrines described. Until 1928, the state's legal principles of tort liability concerning proximate cause and foreseeability were more or less settled in the ordinary case. But then Mrs. Palsgraf alighted innocently upon the railroad platform, and loudly into legal history, following an explosion that sparked intense legal discourse, resounding to this day, concerning the range of plaintiffs to whom defendants' liability for

15. For example: landlord/tenant; employer/employee; and hotel/guest. *See id.*

negligent conduct may extend. *See Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 162 N.E. 99 (1928). While the Court's majority denied Mrs. Palsgraf relief and held that she fell outside the zone of foreseeability encompassing persons to whom the railroad there owed a duty of care, Chief Judge Cardozo articulated the adaptable formulation of the reality underlying the concept of duty and its relationship to risk: "The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation." *Id.* at 100. Judge Cardozo added: "Negligence, like risk, is thus a term of relation." *Id.* at 101.

Among the lessons of Chief Judge Cardozo's duty/risk proposition is the point of relativism essayed in the considerations before this Court: that cardboard standards sometimes cannot accommodate the resolution of uniquely multidimensional disputes. The extraordinary, freak event cannot always be squared in an orderly way within the four corners of uniform standards fashioned and mechanically applied to previously known and predictably patterned events. The linear rule pointing a straight path to resolution may not serve to encompass the distinct twists and turns of the uncommon.

This point was reinforced in *Basso*, 40 N.Y.2d 233, 386 N.Y.S.2d 564, 352 N.E.2d 868. There, the New York Court of Appeals, confronted with paradoxes and incongruities that over time had been grafted onto the duties owed by a landowner to a person whose status on the property varied during different parts of the day and the unique events at issue, decided to discard the traditional plaintiff's classifications and duty distinctions in favor of a single standard of reasonable conduct owed by the defendant to the injured person under all the circumstances. *See also Palka*, 611 N.Y.S.2d 817, 634 N.E.2d at 193.

These cases now define the framework for the scope and application of the duty of care. For a person to answer a situation threatening injury to others with no action at all when particular special circumstances, as determined by law—including the relationship between the given parties—may call for a reasonable response, or to engage in conduct that falls short of what a reasonable person would be expected to do or not to do under the circumstances, defines the rule of liability. An example may capture this point. If a prized customer of a hotel, one who occupies a presidential suite and on whom, to the substantial benefit of the establishment, lavish attention has been paid, decides one day, while drunk, to step out perilously onto a high window ledge of the building, there observed or even encouraged by the hotel manager and executives, valid questions arise as to the hotel operator's obligations to avert or mitigate a reasonably foreseeable calamity which its agents may have played a substantial role in bringing about. *See, e.g., Lindsey v. Miami Dev. Corp.*, 689 S.W.2d 856 (Tenn. 1985); *see also Parvi*, 41 N.Y.2d 553, 394 N.Y.S.2d 161, 362 N.E.2d 960.

Wherever the line of responsibility is drawn, it is clear that defendants in situations such as those illustrated, if disaster does occur, are not free to plead that they had no specific contract or other legal relationship with the person injured creating a cognizable duty that itemized with particularity exactly what defendants were required to do in the situation to avoid or lessen the risk of injury. And while the limits of applicable affirmative obligations necessarily may be somewhat imprecise under some circumstances, even the inexact outer bounds of what may constitute acceptable conduct may serve as a guide to proscribe what may be impermissible. Equally legitimate questions arise if defendants' response in such a moment of crisis is limited to retaining a lawyer to proclaim the existence of a disclaimer of liability or seek a general release from the customer lurching at the edge; or to directing the cashier to demand that the guest first settle all debts to the hotel before plunging

deeper into peril; or to engaging a public relations advisor to pronounce that the tragedy was caused entirely by the victim's imprudence, intemperance or insanity.

■ Of course, the principles described above generally derive from cases involving personal injury. But while they are offered here for the value of analogy, the doctrine the cases stand for is not necessarily limited to exceptional circumstances ending in bodily harm. *See Indian Towing,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (damage to a barge caused by failure of the U.S. Coast Guard to use reasonable care to maintain a lighthouse it had undertaken to operate, though it had no obligation to do so); *Siegel v. Spear & Co.,* 234 N.Y. 479, 138 N.E. 414 (1923) (damage by fire to furniture that defendant-bailor undertook but failed to insure); *Prosser* § 56 at 399. Closer to the point here are cases involving securities brokers and customers.

By reasonable extension, similar concepts have applied to hold brokers accountable for failure to exercise the duty of reasonable care called for under special circumstances to avoid or minimize loss to the client, including failure to inform adequately concerning the extent of risk of loss where the circumstances may have demanded reasonable efforts to provide such warning. *See Conway,* 16 F.3d at 504; *Walker,* 930 F.2d 29, 1991 WL 42938, at *2.[16]

On the basis of the foregoing analysis, this Court concludes that a legal foundation exists which supports application of the duty of care to the broker/customer relationship between Kwiatkowski and Bear Stearns. Moreover, this basis would encompass Kwiatkowski's theory of negligence as alleged here to be evidenced by Bear Stearns's failure to provide particular information essential to the affairs entrusted and which under all the circumstances a

**16.** Perhaps the case that best illustrates these issues and presents facts somewhat analogous to those entailed in the action at bar is the Ninth Circuit's unpublished decision in *Walker.* There the court found evidence that plaintiff Walker was an experienced investor; that she had traded in stock option puts for more than six years; that she selected the options to buy and sell and controlled her own account in all other respects; and that defendant brokerage firm, Quick & Reilly, neither initiated nor directed Walker's investment activity. In fact "Quick & Reilly made no recommendations to [Walker] because she wanted none, and had selected that firm specifically because they gave none." *Walker,* 930 F.2d 29, 1991 WL 42938, at *2. In the stock market's precipitous decline of October 1987, Walker's account suffered substantial losses. Quick & Reilly issued margin calls which Walker could not meet, whereupon Quick & Reilly liquidated her account.

Walker brought an action alleging that Quick & Reilly's handling of her account was both negligent and fraudulent and that the liquidation of her account violated her agreements with the broker. The trial court directed a verdict for Quick & Reilly on Walker's fraud and contract claims but allowed the related negligence claim to go to the jury. The jury found the broker negligent (and Walker comparatively negligent) in handling the account and awarded Walker damages.

Walker appealed the directed verdict on the fraud claim and the jury's finding her 45

percent negligent. She contended that remarks by a Quick & Reilly executive during the crash that her account was "in good shape" and "not in jeopardy" amounted to recklessness. Quick & Reilly argued that as a discount brokerage house it did not purport to give advice and that its agent's remarks could not be considered as recommendations. Walker acknowledged that the broker in fact made no recommendations to her with respect to either strategy or particular transactions.

On this record, the district court concluded that a reasonable jury could find Quick & Reilly's failure to advise Walker of the extent of her exposure to loss to be negligent, but could not reasonably find that omission to be fraudulent. *See id.* The Ninth Circuit, upholding the district court's determination, noted:

> While failure to warn Walker of the magnitude of the risk to which she was exposing herself and making favorable general comments to Walker regarding particular transactions or the condition of her account were properly considered by the jury in reaching its negligence verdict, we cannot say they were sufficient in view of the relationship between the broker and the investor in this case to evidence recklessness or fraud.

*Id.* at *3.

reasonable broker exercising ordinary care would have supplied to the client. It is against this legal framework that the Court must assess the evidentiary record to determine whether the Rule 50(b) or Rule 59(a) standards have been satisfied so as to entitle Bear Stearns to relief.

## V. APPLICATION OF DUE CARE PRINCIPLES

 Applying the principles, precedents and analogies discussed above to the circumstances of the case before the Court, Bear Stearns's argument fails on four separate grounds. First, on the record before Judge Koeltl in connection with Bear Stearns's motion for summary judgment, and based on the evidence developed at trial, there was a demonstration of special circumstances sufficient to remove the case from application of general rules that pertain to the ordinary broker/client relationship. Second, even if the written agreements between the parties did not obligate Bear Stearns to provide Kwiatkowski with specific investment advice, the trial established ample grounds for a reasonable jury to find that the broker/customer relationship which existed at the relevant times between Bear Stearns and Kwiatkowski encompassed a relationship, course of conduct, business dealings and entrustment of affairs that in fact included substantial advisory functions far exceeding both the ministerial, transactional duties associated with the ordinary broker/client relationship and the limitations of the parties' contractual commitments.

Third, even if measured by agency standards associated with the ordinary broker/client relationship, a jury could reasonably have found that in material respects Bear Stearns's performance of some of the corresponding duties to inform its customer of matters essential to the affairs entrusted and important for the customer to know departed from the standard of what a reasonable broker would do acting under the same circumstances. Fourth, even if by reason of the parties' pre-existing agreements, nondiscretionary accounts, or broker/client relationship Bear Stearns had no prior contractual duty to offer Kwiatkowski general investment advice, the trial produced sufficient evidence supporting a reasonable jury determination that in fact Bear Stearns undertook to render Kwiatkowski substantial assistance in handling the situation that threatened further injury to his investments, and that in performing the duties it assumed in this regard, Bear Stearns made matters worse for its customer by failing to exercise the standard. of reasonable care objectively expected of a broker acting under the same circumstances.

### A. Special Circumstances

Bear Stearns's contention that by virtue of Kwiatkowski's nondiscretionary accounts the firm owed no duty to provide Kwiatkowski any specific information or advice overlooks or discounts that special circumstances may arise under which the law recognizes the existence of a duty of reasonable care on the part of a broker that may demand the performance of the actions Bear Stearns denies. As stated above, that obligation is imposed by law and may transcend contractual obligations or even fiduciary duties manifesting separate intent of the parties. *See Kwiatkowski I,* 1999 WL 1277245, at *16 ("Moreover, the plaintiff's negligence claim alleges that the defendants violated duties of care they owed to the plaintiff as his broker and advisor and it is clearly broader than the dismissed claim for breach of contract."); *Scott,* 886 F.Supp. at 1080 (rejecting the argument that the negligence claim must be dismissed as a matter of law because the clients' relationship with the bank was contractual, the court noted that the trial record established that "the relationship between [defendant bank] and [plaintiffs] went well beyond the relationship of creditor and debtor").

The special circumstances arising from the facts evidenced at trial in this case are

as palpable as they are truly unique.. Kwiatkowski was not just another customer with a nondiscretionary account at a brokerage firm, or merely a name on a trading statement or a voice at the other end of the telephone. Nor did the occurrences that gave rise to this litigation entail a commonplace broker/client dispute over trading losses. Rather, Kwiatkowski was, as Schoenthal testified he was told by Sabini and by Bear Stearns President and Chief Executive Officer, James Cayne ("Cayne"), "a very valued customer of Bear Stearns." Tr. at 1197. Kwiatkowski qualified to be classified, in the description of Bear Stearns's annual report, as one of "a select group of private investors" whose accounts were handled by the firm's Private Client Services Group, and to whom access to Bear Stearns's trading desks worldwide offered "a level of service and investment timing comparable to that which [Bear Stearns] offer[s] our largest institutional clients." Tr. at 107, 112.

By the fall of 1994, Kwiatkowski maintained at Bear Stearns a security account containing various forms of equities with a market value in the tens of millions of dollars. Tr. at 559–60; 1374–75. In 1991, he transferred to Bear Stearns a foreign currency futures account he had held at another bank, allegedly swayed in part by Sabini's representations that Bear Stearns possessed the full range of expertise, services and resources capable of properly handling accounts of such large investments.

Kwiatkowski's broker/client relationship with Sabini, and the scope of services Sabini performed primarily for Kwiatkowski, seemed out of the ordinary by any measure. By his own account, Sabini frequently talked to Kwiatkowski as many as twenty or thirty times daily, continually providing him with the latest market information. Sabini regularly communicated as well with Kwiatkowski's accountant, Themistocleous. In fact, Sabini devoted a substantial part of every workday serving Kwiatkowski's accounts, from which during the years here at issue he derived approximately half of his commission earnings.[17]

Most compelling, by the end of November 1994, Kwiatkowski had acquired foreign currency futures holdings through Bear Stearns whose magnitude was not only unique but probably unprecedented for any single individual investor: 65,000 contracts carrying a market value of approximately $6.5 *billion* in futures of four foreign currencies, all long on the U.S. dollar and all on the CME. By his version of events, in making this investment, Kwiatkowski acted on the strength of Sabini's advice and was encouraged by the bullish forecasts of Bear Stearns's chief economist and foreign currency experts.

In any event, the size of this position represented a fourfold increase over Kwiatkowski's previous high of 16,000 foreign currency contracts he had placed through Bear Stearns in September 1992 and

17. Bear Stearns counsel sought to characterize Sabini as Kwiatkowski's "slave". Tr. at 84. Tadeusz Kondratowicz ("Kondratowicz"), Bear Stearns's compliance officer responsible for internal oversight of Kwiatkowski's futures accounts, stated that whenever he went to see Sabini, he was always on the telephone with Kwiatkowski and that it was Kondratowicz who first referred to Sabini as working for Kwiatkowski like a slave. Tr. at 1380–81. In his testimony, Sabini described his daily routine as follows: "I would, as I said, I would come in at anywhere from 6:30 to 7:00 everyday and anything of interest or of immediate expediency I would call Mr. de K, but on a normal day I would compile a pile of stuff and on our first call we would go over what was happening in the markets in Europe and in Asia and then he would say any news items and I would go over everything from the Dow Jones, the Bloomberg, the Reuters, any of the publications, Wall Street Journal, Financial Times, any magazine articles that would pertain along with any information from Bear Stearns which would come in normal distribution. That would pretty much take up until 8:15 to 8:20 when the markets opened and then we would be continuously on the phone on a need be basis and at the end of the day the markets closed pretty much, stocks close at 4:00, futures close at 3:00 along with the bonds, and we would figure out where he stood on that day." Tr. at 233–34.

closed in January 1993. Bear Stearns's own executives testified that they had never encountered an individual position of such magnitude.[18] Kwiatkowski's investment not only carried unmatched proportions, but it made him at the time one of the single largest individual holders of certain currency positions in the country, if not in the world. The investment amounted to in excess of 30 percent of the open interests in certain currencies on the CME at the time. *See* Tr. at 167.

Also exceptional was that Kwiatkowski's full position, originated and completed between October 28 and November 21, 1994, was initially traded entirely in a single market, the CME, rather than the OTC market, where over 90 percent of all foreign exchange trading is conducted and where more large private investors carry out their foreign currency transactions.[19] *See* Tr. at 1102, 1104.

This circumstance assumed large importance because it served as the basis for Bear Stearns executives at the highest levels of the firm intervening to undertake a role in guiding the events that followed.

In fact, to deal with the ramifications of these circumstances required the personal involvement of Bear Stearns's President and Chief Executive Officer, the Executive Committee, the heads of its futures and foreign currency trading departments, its chief economist, and several other of Bear Stearns's most senior managers. Cayne testified that as many as 20 Bear Stearns employees were involved in monitoring various aspects of Kwiatkowski's accounts. *See* Tr. at 1062–63. In addition, the handling of Kwiatkowski's foreign currency trading took on such significance within the firm that, sometime in November 1994, internal responsibility for compliance functions relating to Kwiatkowski's account was taken from Kondratowicz, the assigned compliance officer, and assumed by Bear Stearns's senior management. *See* Tr. at 1327; 1361–62; 1365.

The sheer size, placement and visibility of Kwiatkowski's foreign currency position made it highly exposed and rendered him subject to distinct risks and vulnerabilities.[20] The size of the position itself, ac-

---

**18.** Schoenthal testified that in his 27 years of professional experience he had not known of a currency position in the futures market or the CME of this size. *See* Tr. at 1111–12. In a similar vein, Kwiatkowski's expert witness, Dr. David DeRosa ("DeRosa"), stated that 65,000 contracts would be considered neither institutional or really large but "just out of this world. I've never heard of such a thing in my life. And I've been in the business all of my adult life." Tr. at 1443.

**19.** On this score, DeRosa declared that placing 65,000 foreign currency futures contracts entirely on the CME "is about the craziest thing I ever heard because you can't accumulate the position without everybody knowing it and how are you going to get out of that?" Tr. at 1443.

**20.** Sabini testified that because of its size, getting out of such a position on the CME would be at least as visible as purchasing the contracts. The extent of the open interests concentrated in a single holder would be known and would encourage "front running," an unlawful practice under which other traders who noticed or had reason to perceive activity from a major account would make a run on the market by taking the other side of

trades in anticipation that there would be pressure on the market. *See* Tr. at 175–77. To the same effect, DeRosa testified that: "If they know you got the position and they know you're going to come out of there, it's like riding into a blind canyon to a certain extent. So, if you've got a big position, you've got to wonder how and when you're going to be able to dump all that currency back on the market without blowing yourself up because you upset the market." Tr. at 1437. With regard to visibility, DeRosa asserted: "You know, there's an old saying that somebody who has a position never talks to a newspaper reporter. You don't ever want the market to know you've got the position because they're going to track you like junkyard dogs. And they're going to wait for you to get in trouble and when you know you're in trouble, and you have to sell, they're going to sell first." Tr. at 1440. This view was essentially confirmed by the testimony of Ronald Hersch, Director of Bear Stearns's futures department, who stated: "I can't think of an advantage of being noticed in the market." Tr. at 1313.

cording to some of the disputed evidence, magnified the exposure. These risks existed not only as to Kwiatkowski but potentially as to other foreign currency investors whose holdings could have been affected by the trading related to such a massive concentration of open interests in certain currencies in a single individual, a situation that in a period of low liquidity and forced selling could drive prices down and possibly cause a financial panic.

The evidence at trial established that the size and visibility of Kwiatkowski's position elicited expressions of concern to Bear Stearns's senior managers by officials of the CME and government regulators from the federal Commodities Futures Trading Commission ("CFTC").[21] See Tr. at 168; 1053. The circumstances prompted Bear Stearns's executives to apprise Kwiatkowski, in the event he chose to roll over the contracts when they were due to expire in early December 1994, of the relative advantages of moving the position from the CME to the OTC.

Out of this investment, at one point in mid-December 1994, Kwiatkowski had recorded net gains of $228 million. On December 28, 1994, the dollar declined, and he registered a loss of $112 million. On January 9, 1995, he suffered another $100 million decline. Despite these losses, Kwiatkowski chose to retain his investment, a decision he attributed in part to reassurances by various Bear Stearns officers. By Presidents Day in February 1995, as the value of the dollar suffered steady decline, Bear Stearns was apprehensive enough about its own exposure in the event Kwiatkowski's account fell below margin requirements that Sabini and a large number of his foreign currency traders were required to report for duty over the weekend to liquidate the foreign cur-

rency account if necessary, and Kwiatkowski was later asked to post additional collateral to secure margin calls beyond the $250 million he had already pledged.

Coinciding with this period in early 1995, the value of the dollar experienced a substantial decline largely attributed to a financial crisis in Mexico to which the United States responded with significant economic assistance. See Tr. at 1194; 1479–80. The extensive American aid caused concern in European countries, especially after the Federal Reserve Board in January of that year declined to raise interest rates. The crisis roiled the currency markets, causing exceptional volatility and augmenting financial exposure to any investor holding a large position backing the U.S. dollar. These circumstances served in large part as the backdrop for a change in Bear Stearns's foreign currency experts' forecast for the dollar to negative, an altered outlook that Kwiatkowski claimed was never communicated to him. See Tr. at 511–12.

For a position the size of Kwiatkowski's, the circumstances posed a major threat. Indeed, by the end of February and early March 1995, the dollar was virtually in a free fall, and Kwiatkowski experienced continual erosion of his position that lowered its value to a point approaching the limit of his margin and the worth of equities in his Security Account held by Bear Stearns as collateral to satisfy any unpaid margin calls. By the weekend of March 3, 1995, market conditions compelled a total liquidation of Kwiatkowski's remaining position, after some delays and choices of timing and markets that form part of the disputed events and associated losses.

On these facts, the jury could reasonably have found that these parties, by vir-

---

**21.** Cayne testified that the government regulators' inquiry was prompted by concerns about efforts to corner the market. See Tr. at 1053. DeRosa testified that "[i]f you're selling, each time you go back, you'll find a lower price, but you actually run the risk, if there's very little liquidity, that you could cause a

panic. If you sell enough, they think you know something. They don't know what you know, but you're out there selling a lot foreign exchange. You've got to know something, so maybe they should sell, too." Tr. at 1435.

tue of their longstanding broker/client relationship, dealings, conduct, and affairs entrusted in connection with their understandings, were entangled in an exceptional situation, a business relationship and related human drama that indicated corresponding exceptional responses. The actual circumstances reveal evidence of an advisory relationship in connection with matters Kwiatkowski entrusted to Bear Stearns, and of Bear Stearns undertaking to render certain services to assist Kwiatkowski in dealing with the difficulties his foreign currency position encountered.

A rational jury could have found that, in performing the duties Bear Stearns assumed, the firm failed as a whole to exercise the degree of ordinary care, professional skill and prudence required in connection with the general broker/client relationship, or that, by virtue of the partial assumption of performance, Bear Stearns's obligation to act with the ordinary care the circumstances called for transcended the self-imposed limitations of customer account labels and of boilerplate disclaimers. This singularity is critical. It represents the element that defines the scope of the duty of care Bear Stearns owed Kwiatkowski and that qualifies for treatment of this case, not under rules of general application, but under standards more fitted to the special circumstances inherent in the time and events.

B. *Advisory Relationship*

The Court referred above to the evidence of the substantial advisory functions Bear Stearns assumed in connection with its dealings with Kwiatkowski and his accounts.[22] In this regard, the record established the following:

- Sabini testified that he had daily conversations with Kwiatkowski, sometimes as many as 20 to 30 times a day, and affirmed that he regularly provided him with information "about the markets and about current events and what might be happening that might be influencing the market." Tr. at 135. When requested by Kwiatkowski, Sabini would put Kwiatkowski in contact with Bear Stearns's financial analysts and experts for more informed opinions. *See* Tr. at 136.[23] Even under Bear Stearns's expert's portrayal of a broker's duties and Sabini's performance, these services encompassed providing advice.[24]

- Sabini testified that Kwiatkowski's second foreign currency position at Bear Stearns, opened and held in the fall of 1992, was influenced in part by the encouraging forecast for the dollar expressed by Kudlow, whose opinion that he was "still bullish on the dollar" Sabini conveyed to Kwiatkowski. *See* Tr. at 138–39. According to Kwiatkowski, Kudlow expressed his opinion that the dollar was then undervalued, and that based largely on these favorable views, Kwiatkowski increased his position to 16,000 futures contracts, all on the CME, in September 1992. *See* Tr. at 482. On cross-examination, Sabini acknowledged that Kudlow's encouraging expressions of confidence in

22. *See* Part III.C, *supra.*

23. *See* n. 17, *supra,* for discussion of Sabini's extensive regular communications with Kwiatkowski.

24. In describing a broker's regular functions, Weir testified: "[T]he broker is providing information and insight to the extent they have it into the market and providing opinions and so forth." Tr. at 1867. Under cross examination, he elaborated that while Sabini did not act as a commodity trading adviser, he

nonetheless rendered advice in the ordinary use of the word:

Q. Did Mr. Sabini as a broker and as you have described the duties of a broker in your testimony, did Mr. Sabini provide Mr. deK with opinions and advice?
A. Yes.
Q. That is, in your experience, that is not unusual, right?
A. No. That is advice again in the colloquial sense of the term.
Tr. at 2061–62.

the dollar constituted advice.[25] Kwiatkowski testified that when he liquidated the position in January 1993 he discussed it with Bear Stearns "and they thought the advisement was a change of feelings about it." Tr. at 483.

- Kwiatkowski testified that although ultimately he made the decision to proceed with his subsequent foreign currency investment in the fall of 1994, he increased his position in part on the basis of Sabini's advice to the effect that "this time the dollar will do what you always believed it would." Tr. at 490.[26] At that time, Sabini transmitted to Kwiatkowski a copy of Bear Stearns's Global Spectator for November 1994 highlighting the dollar as an investment opportunity and referring to the highly optimistic opinions of Angell, who had succeeded Kudlow as Bear Stearns's chief economist. *See* Tr. at 491–92. Even under the standard articulated by Bear Stearns's expert witness of brokers' practices in handling nondiscretionary accounts, Sabini's communications referring to a particular currency, its price at the moment and the timing of investment, could reasonably be viewed as crossing the threshold into a "trade recommendation." [27]

- Following calls in mid-November 1994 from officials of the CME and the CFTC inquiring about the size of Kwiatkowski's position, Bear Stearns executives conferred and decided to inform Kwiatkowski of the advantages of shifting his 65,000—contract position from the CME to the OTC.[28] Cayne, Schoenthal and Sabini all acknowledged that this communication constituted advice.[29]

- Kwiatkowski testified that he felt more comfortable maintaining his currency futures investments in a regulated exchange because of the public protections it offered, and that he was unfamiliar with the methods and risks associated with trading on the OTC. Nonetheless, Kwiatkowski was told that his positions would be safer, less

25. Sabini responded to questions as follows:
Q. And Mr. Kudlow told Mr. deK he was still bullish on the dollar, right?
A. Yes.
Q. Was that advice?
A. I guess it was.
Tr. at 1662.

26. According to Kwiatkowski, Sabini "called me up everyday and advising [sic] me about this and that. One day he called me that this time is the time to buy the dollar, he said. I heard from all my experts here, myself, I believe, he said, that this time the dollar will do what you always believed it would do." Tr. at 490.

27. Weir testified that "[w]ith non-discretionary accounts our brokers were always very careful not to give or to be very careful about giving a recommendation that would be advising a customer as to a particular price or particular commodity—well, giving all of the information necessary for the customer to place a particular order like you should buy corn futures, the March contract at such and such a price at this time. That is a trade recommendation. That is a more serious thing." Tr. at 1868.

28. This communication occurred during a telephone call involving Kwiatkowski, Sabini, Cayne and Schoenthal. *See* Tr. 179, 504, 958, 1121–22, 1132–34. Kwiatkowski testified that "[t]he CME is controlled by the Chicago Board of Trade. The other one is not controlled by any government agency. It is just from one bank and from individual to individual so I was hesitant, but still I had faith in them and they assured me that it is too much on the one to have them all in the CME." Tr. at 502.

29. Schoenthal, for example, testified:
Q. You were giving him advice to move to the OTC, right?
A. We were telling him what our thoughts were, why we thought that he's better off moving his position into the over-the-counter market.
Q. Don't you call that advice?
A. In a way, yes.
Tr. at 1134. *See also* Tr. at 958. Themistocleous also confirmed Kwiatkowski's understanding that the opinions he had received from Bear Stearns in connection with the transfer of his position to the OTC constituted advice. *See* Tr. at 641.

visible and more liquid on the OTC (*see* Tr. at 1132–33), and he acceded to shift half of his contracts to the OTC.[30]

- Kwiatkowski claimed he wanted to liquidate his position after suffering a $112 million loss on December 28, 1994, but was dissuaded by the advice of Sabini and Schoenthal that he should hold on because the decline was probably related to light trading volume typically experienced during the holidays, and that it was unwise to liquidate at that time on account of the short period and thinner market. *See* Tr. at 185–86; 508–09; 1140–41.

- Kwiatkowski said that after suffering a $100 million loss on January 9, 1995, he again contemplated liquidating the balance of his positions and discussed the matter with Sabini, who put Kwiatkowski in touch with Angell. According to Kwiatkowski, Angell said that the dollar was still undervalued and that the market would rebound. Kwiatkowski claimed he accepted the advice to hold on.[31] Sabini acknowledged that during this period, Kwiatkowski had contemplated closing or reducing his position and that they discussed the matter. *See* Tr. at 187–88.

- At some point following Kwiatkowski's January 9, 1995 loss, Sabini met with Themistocleous. Sabini expressed concern about the dollar and asked Themistocleous to talk to Kwiatkowski to urge him to reduce his position or fix a price limit at which to get out. *See* Tr. at 187, 657.

- Kwiatkowski testified that during a telephone conference with Schoenthal in January, 1995, Schoenthal told Kwiatkowski that he was pessimistic as to the Japanese yen because American policy at that time favored strengthening the yen, and advised him to reduce his position. Kwiatkowski decided to liquidate a portion of his yen holdings.[32] Schoenthal, while denying that he gave advice, confirmed the substance of these conversations and that Kwiatkowski subsequently liquidated some of the yen holdings. *See* Tr. at 1146–47; 1195. Sabini, on the other hand, testified that on this point Kwiatkowski "took that advice from Mr. Schoenthal." Tr. at 257. Later in January or early February, in response to Sabini's conversation with Themistocleous, Kwiatkowski decided to liquidate the rest of his yen position. *See* Tr. at 515.

- Kwiatkowski testified that during a telephone conference with Schoenthal on March 3, 1995, he asked that his remaining positions be closed and that Schoenthal advised that it was not a good time to close due to lower liquidi-

---

**30.** On this point Cayne responded to cross examination as follows:

> Q. Did you advise Mr. deK in the conversation that you remember having with him that he would be able to liquidate his foreign currency positions faster and more efficiently on the OTC than on the CME?
> A. Correct.
> Tr. at 958–59.

**31.** Kwiatkowski testified:

> Q. [Angell] said he continued to believe the dollar was undervalued?
> A. So I said, how can you do that. He said because, you know, in January, December, January, the volume, little volume, little volume creates this volatility, and dismissed it, it was a passing phase, nothing, that if you hold on you will get it back.

Q. Did you accept this advice at that time?
A. Yes.
Tr. at 510.

By Sabini's account, while Angell had been bullish in November 1994, on this occasion he was neither bullish nor bearish. Rather, he talked economics that neither Kwiatkowski nor Sabini understood:

> Q. After this conference call you didn't think Mr. DeK understood what Angell was saying either did you?
> A. I think we might have discussed it and we kind of said—he didn't—we didn't understand what he said and Mr. DeK, said, well, okay, we will just continue on.
> Tr. at 192.

**32.** According to Kwiatkowski, he agreed to cut back "[w]hatever they recommended; I think half the position." Tr. at 514–15.

ty in the market on Friday afternoon. Instead, according to Sabini: "I believe Mr. Schoenthal advised him at the time that it would not be in his interest to do it because it was going into a weekend and there would be no real buyers for his sales or vice versa".. Tr. at 209; 516; 1158–59.[33]

• During the course of the liquidation that occurred on March 5 and 6, 1995, Schoenthal, though seeking Kwiatkowski's approval for each sale, recommended the timing and size of each transaction. *See* Tr. at 1197.[34]

• At Cayne's request in December 1994, Sabini conveyed the recommendation that Kwiatkowski purchase 500,000 shares of China Yuchai International Limited ("China Yuchai"), a Chinese manufacturer of diesel engines whose initial public offering Bear Stearns managed as lead underwriter. While disavowing that the request constituted advice from him, Sabini conceded that the message relayed advice from Cayne. *See* Tr. at 125–27; 1666. Kwiatkowski said he invested the $5 million relying solely on Sabini's word. *See* Tr. at 489.

Bear Stearns argues that any advice it may have provided to Kwiatkowski occurred only occasionally as an incidental part of any broker's routine services to a customer. This characterization does not accord with the evidence of the advisory relationship summarized above. Rather, even viewing the record independently and in the light most favorable to Bear Stearns, the trial produced substantial evidence to support a reasonable finding that

the opinions, recommendations and advice Bear Stearns provided Kwiatkowski through Sabini and other senior managers during the times and events here relevant, occurred on a continuous basis and encompassed matters within the scope of the relationship that, far from mere ancillary routine, embodied the full magnitude of "handling" Kwiatkowski's accounts, with all the considerable implications that such responsibility entailed.

The Court believes that, on the evidence at trial, Bear Stearns cannot reasonably contend that the subjects of the contested advice could be minimized to collateral information Sabini volunteered from time to time. In fact, much of the denials and remonstrances Bear Stearns asserts to rebut Kwiatkowski's arguments and evidence of these advisory functions serve only to confirm the existence of sharply disputed factual issues, many of which go to the credibility and weight the jury accorded the evidence.

### C. *Bear Stearns's Fees*

Nonetheless, Bear Stearns insists that under the terms of Kwiatkowski's nondiscretionary accounts it had no contract to serve Kwiatkowski as an investment advisor and was not paid to render such services. *See* Tr. at 1051–52; Defendants' Reply Memorandum at 7. This argument is deficient in several ways. First, as regards a claim of negligence, the absence of a contractual obligation is not necessarily determinative of the existence of a duty of reasonable care whose breach could give

---

**33.** Regarding his conversation with Schoenthal, Kwiatkowski testified: "I said, things are not going the way you predicted and now I would like you to get me out today on the dime you promised," to which Kwiatkowski understood Schoenthal to reply "not today ... it is Friday and it is late or something." Tr. at 516. Schoenthal acknowledged having expressed to Kwiatkowski during a conversation on March 3 his view as to why additional liquidation was inadvisable, although clarifying that Kwiatkowski only wanted to lighten up some more because there was not any way

he could have fully liquidated on that day. "I believe we had a conversation with him and we explained to him that it's Friday afternoon, that we think it would be detrimental to him to try to liquidate any more in the afternoon because the markets normally close up in New York by 12 o'clock." Tr. at 1158.

**34.** Evidence of these conversations is contained in the transcript of the tapes of the conversations that were played at the trial.

rise to liability for resulting injuries. *See* discussion at IV.A.4, *supra.*

Second, Bear Stearns's contention reflects an unduly narrow view of the concept of "advice," suggesting that what the term encompasses occurs only in the context of a discretionary brokerage account, where the customer actually delegates to the broker full management of the account and control over investment decisions. In fact, advice could be undertaken, as the record here indicates, and as Weir suggested, in the "colloquial sense of the term" (Tr. at 2062), not just pursuant to contractual obligations, but on a much broader basis by the parties' conduct and course of dealings. Moreover, advice is not limited to the affirmative recommendations and encouragement of investment decisions that may be specifically contracted for in connection with a discretionary accounts. Rather, the notion embraces as . well the provision of notice and information that may fall within the scope of matters entrusted by and important to a principal in the course of an ordinary agency relationship where the parties' dealings, as the jury could reasonably find here, manifest undertakings to provide such material.

Third, the services at issue here entail not so much rendering investment "advice" in the narrow sense propounded by Bear Stearns, but conducting risk analysis and disclosure and providing other forms of information. Moreover, where applicable, the obligation to perform these functions stems from and is governed not necessarily by contractual commitments, but by industry regulations and practices and the broker's own internal procedures. It is the failure to observe reasonably these standards that serves, in the context of all the circumstances and as the jury was instructed here, as some basis for the standard of care against which a breach of duty may be measured.

Finally, even if Bear Stearns had no contract under which it was compensated as an investment advisor, the appropriateness and reasonableness of Bear Stearns's charges for its services to Kwiatkowski's accounts were sharply contested and produced widely divergent factual evidence at trial. Kwiatkowski introduced substantial evidence detailing various ways by which Bear Stearns derived significant earnings or stood to gain appreciably from whatever relationship it maintained with Kwiatkowski and from Kwiatkowski's exceptionally large investment accounts that Bear Stearns handled:

- Kwiatkowski maintained securities accounts at Bear Stearns from 1988 to 1995 which at various times held 1.25 million shares of Trans World Airlines, one million shares of Texaco, and 600,000 shares of International Business Machines Corporation, in addition to bonds, treasury bills, gold and other forms of investments, all with a market value in the tens of millions of dollars.[35]

- Bear Stearns, as lead underwriter of the initial public offering of China Yuchai stock, caused Kwiatkowski to acquire 500,000 shares, a $5 million investment in the placement of the securities. *See* Tr. at 125–29. From this transaction, Bear Stearns stood to derive not only financial but market and public relations gains.[36]

- Moving Kwiatkowski's foreign currency to the OTC enabled Bear Stearns to benefit from what Schoenthal characterized as a "trading opportunity" to

**35.** *See Bissell,* 937 F.Supp. at 240–41, for a description of the fees brokerage firms earn from interest on collateral held in a margin account. *See also Press,* 166 F.3d at 535.

**36.** According to Kwiatkowski, Sabini asked him to make the investment as a favor: "They need another person to invest because they [are] going to go public next week and he [Cayne] wants to have an outsider such as you investing." Tr. at 486–87. Themistocleous recalled about China Yuchai that Sabini said it was a company Bear Stearns "had problems floating" and that Sabini was told, "why don't you ask your friend [Kwiatkowski] to help us out." Tr. at 643–44.

earn profits from markups by acting as a principal on the other side of the customer's position. *See* Tr. at 179–82; 1122–23.[37]

- With the transfer of half of Kwiatkowski's position to the OTC, Bear Stearns benefitted not only from markups and trading profits it realized when it acted as a principal, but, in addition, Sabini continued to earn the same amounts of commissions on Kwiatkowski's transactions on the OTC as he did on the CME trades, despite that ordinarily Bear Stearns did not charge commissions on its OTC transactions. *See* Tr. at 180–81; 1127–29.[38] Moreover, there was an extensive factual dispute regarding whether the rates of the commissions Bear Stearns charged Kwiatkowski were disproportionate relative to the size of his position and to market practice.[39] *See* Tr. at 1444.

## D. *Breach of Due Care*

The record also contains substantial disputed evidence from which the jury, within the context of the actual relationship then existing between the parties and the extraordinary external events that prevailed in late 1994 and early 1995, could reasonably infer lack of due care in Bear Stearns's dealings with Kwiatkowski and in its handling of his accounts, as measured in the context of the considerations defining the standards and scope of due care governing the broker/client relationship that emerge from the cases discussed above. This evidence includes:

**37.** According to Sabini's testimony, on investments traded on the CME, Bear Stearns would act only as a broker, not as a principal. But on the OTC market, Bear Stearns would take the customer's position and hold it as principal, looking to create a market in the currency by quoting a price to buy or sell. If the firm buys low and sells higher, it makes a profit, and takes a risk of loss if it has to sell lower during the brief time it holds the position. *See* Tr. at 182. The trial record also elicited evidence of additional instances of Bear Stearns officials seeking to avail themselves, though not successfully, of other trading opportunities in some way connected to the firm's relationship to Kwiatkowski. Cayne testified that, influenced in part by Kwiatkowski's theories regarding the dollar and the strength of Kwiatkowski's position, Cayne made a personal investment in the dollar at the same time Kwiatkowski completed the rollover of his contracts in December 1994. *See* Tr. at 974–75. On the very day Kwiatkowski's position had been entirely liquidated in order to protect Bear Stearns from margin exposure, an event whose sheer volume concentrated in a short period may have had some effect in lowering the price of the dollar, Bear Stearns perceived an opportunity to purchase dollars. Warren Spector, Bear Stearns's head of fixed income and a member of the Executive Committee, directed Schoenthal to invest $200–300 million on a purchase of dollar futures contracts, then the largest position he had authorized on behalf of Bear Stearns in the foreign exchange market. *See* Tr. at 1261; 1288–89.

**38.** According to Louis Guth, Kwiatkowski's expert witness, Bear Stearns earned $2,668,302 in commissions alone from the trading in Kwiatkowski's accounts during the period October 28, 1994 to March 6, 1995. *See* Tr. at 273. This amount did not include the revenues Bear Stearns derived from markups and trading profits made when it acted as principal on Kwiatkowski's OTC trades. Schoenthal estimated that Bear Stearns's markup profits for the weekend of March 5 were approximately $2.5 million. *See* Tr. at 1180. From December 1994 to March 1995, Bear, Stearns Forex, Inc. earned $5–$6 million from transactions in Kwiatkowski's account. *See* Tr. at 1183.

**39.** According to the evidence, Bear Stearns's commissions on Kwiatkowski's foreign currency trading amounted to $25 per round turn, or purchase and sale of a contract. DeRosa testified that this amount was more than twice what he would expect a customer to pay on a position as large as Kwiatkowski's. *See* Tr. at 1444. DeRosa also claimed that Bear Stearns's markups on its OTC trades during the liquidation were as much as 16 times the customary practice and that nobody pays both commissions and markups on OTC trading. *See* Tr. at 1444; 1504. Weir, on the other hand, testified that there was nothing unusual about a commission of $25 per round turn, which in his experience ranged between $41 to $80 per round turn (*see* Tr. at 1979) and that no industry norm existed to define what constitutes a reasonable markup on OTC trades. *See* Tr. at 1982–83.

1. *Placement of the 1994 Foreign Currency Position*

A jury could reasonably find failure by Bear Stearns to exercise due care in connection with Kwiatkowski's placement in the fall of 1994 of Kwiatkowski's 65,000 contract, $6.5 billion position. Kwiatkowski's argument and the evidence adduced in its support centered on two points. First, Kwiatkowski claimed that Sabini failed to conduct new risk analysis and suitability research in connection with the investment and instead relied upon the documentation and disclosures Bear Stearns already had on file related to Kwiatkowski's opening his foreign currency trading account at Bear Stearns in 1991. Kwiatkowski contended, however, that his 1994 position exceeded by fourfold the size of his previous foreign currency transactions at Bear Stearns almost two years before, and that under both Bear Stearns's internal procedures and industry practice the firm had an ongoing obligation to conduct new suitability and risk inquiries and provide corresponding warnings relating to any significant change in the magnitude or form of a customer's investments.

The evidence established that Sabini did not perform nor share with Kwiatkowski any new risk analysis associated with the acquisition of the 65,000–contract position during October and November 1994. *See* Tr. at 145–146. Sabini stated that he brought Kwiatkowski's investment to the attention of Bear Stearns's Credit Committee and the Executive Committee, which approved the transaction. The consideration of the request by these Bear Stearns officials, however, was limited to the margin requirements necessary to protect Bear Stearns as Kwiatkowski's position increased. *See* Tr. at 1266–67.

With regard to industry norms and internal procedures applicable on this point,[40] the parties and their expert witnesses differed diametrically. Bear Stearns argued that it fully complied with its risk disclosure duties when Kwiatkowski executed the agreements opening his futures trading account in 1991 and with the letter agreement Kwiatkowski signed on January 19, 1995. Kwiatkowski countered that these obligations were ongoing and required new analysis and disclosure as market and account conditions changed. These differences raised a substantial factual dispute whose resolution rested on the credibility of the witnesses and the weight assigned to the evidence.[41]

---

**40.** *See* New York Stock Exchange ("NYSE") Rule 405, which provides in part: "Each member organization ... [shall] use due diligence to learn the essential facts relative to every customer, every order, every cash or margin account accepted or carried by such organization ...." Regulation 1.55 of the CFTC requires a disclosure of the risks associated with commodities futures trading and contains minimum standard provisions that must be provided to a customer opening a commodity account. *See* 17 C.F.R. § 1.55. Compliance Rule 2–30 of the National Futures Association ("NFA"), which is based on CFTC Rule 1.55, provides: "(a) The member or associate shall in accordance with the provisions of this rule obtain information about its futures customers who are individuals and provide such customers with disclosure of risks of futures trading.... (b) The member or associate shall obtain the information and provide the risk disclosure at or before the time the customer first opens a futures trading account to be carried out or introduced by the member or first authorizes the member to direct trading in a futures account for the customer".

**41.** Cayne and Sabini testified that under Bear Stearns's internal procedures NYSE Rule 405 know-your-customer obligations apply equally to security and commodity accounts. *See* Tr. at 966–67; 153. And, in Sabini's understanding, the guideline imposed on the account executive a duty to conduct new risk analysis upon any material change in a customer's investment position. *See* Tr. at 153. DeRosa contended that Bear Stearns's procedure as described by Sabini was consistent with securities industry practice, charging the broker with a duty of not putting a client in an unsuitable trade. *See* Tr. at 1466. In his view, this obligation obtained not only the first time an investment is made but extended to subsequent transactions as well, requiring updated risk disclosure as necessary and appropriate as the customer's investment and market conditions change. *See* Tr. at 1458.

Under existing case law cited above, and consistent with the Court's instructions to the jury, a broker's failure to adhere to industry norms and practices relating to suitability and risk disclosure may be considered with other circumstances as evidence of a breach of due care. *See Thropp*, 650 F.2d at 820 ("When a defendant has disregarded rules that it has established to govern the conduct of its own employees, evidence of those rules may be used against the defendant to establish the correct standard of care"); *Miller*, 1986 WL 2762, at *5 ("More than one circuit has inspected the internal compliance manual of a New York Stock Exchange member firm to determine whether the firm failed to supervise properly an employee, and should thus be held liable under theories of negligence or respondeat superior."); *Zagari v. Dean Witter & Co., Inc.*, 74 Civ. 2007, 1976 WL 838, *14 (N.D.Cal. Sept.27, 1976) ("The standard of 'due diligence' that the know-your-customer rule imposes upon exchange members with regard to customer transactions and orders is merely a part of the negligence concept of common law."). *See also Piper, Jaffray & Hopwood Inc. v. Ladin*, 399 F.Supp. 292 (S.D.Iowa 1975); *Mercury Inv. Co. v. A.G. Edwards & Sons*, 295 F.Supp. 1160 (S.D.Tex.1969).

Second, Kwiatkowski argued that Bear Stearns placed Kwiatkowski's position in *the wrong market in the first instance.* During the period of almost one month that it took Kwiatkowski to build up his position of 65,000 contracts, Sabini, according to his own testimony, informed Cayne but never talked to Schoenthal. *See* Tr. at 170–71. Cayne testified that prior to the transfer of a portion of Kwiatkowski's position to the OTC in connection with the December rollover, no one at Bear Stearns other than Sabini had had any role in handling Kwiatkowski's account. *See* Tr. at 945. Cayne, Schoenthal and Weir all testified that Sabini had no foreign exchange or commodities experience other than what he acquired while executing Kwiatkowski's trades, and there was evidence that Sabini himself acknowledged he did not fully understand the workings of the OTC.[42] *See* Tr. at 638. Thus, while Sabini alleged he informed Cayne and the Executive Committee of Kwiatkowski's position, according to Cayne, neither he nor any other members of that Committee discussed the advisability of maintaining a 65,000 contract position entirely on the CME, nor were they aware of any advantages of the OTC over the CME. Cayne asserted that no one knew there was an option other than the CME. *See* Tr. at 956.

By contrast, Schoenthal expressed surprise when he learned that a customer of Bear Stearns had accumulated 65,000 foreign currency contracts entirely in the CME. *See* Tr. at 172; 1107; 1112. Schoenthal testified that the outright placing of the position on the CME "could have hurt the customer if he had to get out of that position in a very brief period of time," in which event liquidating large amounts of currency could have moved the market against the customer. *See* Tr. at 1118–19. Sabini stated that, prior to Kwi-

In sum, under DeRosa's interpretation of industry custom and practices, "[i]t is the broker's responsibility to say, no." Tr. at 1466.

Weir, on the other hand, disagreed that customs and standards in the futures and commodity business impose on a broker a continuous obligation to advise the customer about risks. In his view, NFA Compliance Rule 2–30 requires risk disclosure only the first time a customer opens an account; he specifically rejected the notion of an ongoing responsibility to advise the customer about risks. *See* Tr. at 1903–07. With regard to the NYSE Rule 405 know-your-customer stan-

dard, Weir opined that the broker soliciting an order should determine at the time whether the trade is suitable, but that it is the customers' job, not the broker's, to make the assessment and decide whether futures trading is suitable for them. *See* Tr. at 1916.

**42.** Themistocleous testified that Sabini told him in December 1994 that he did not really know what the OTC market was, and that Kwiatkowski himself had agreed to transfer a portion of his position to the OTC without really understanding how it worked. *See* Tr. at 638.

atkowski's placing the 65,000 contract position on the CME, Sabini did not inform Kwiatkowski that he might find more liquidity and better prices on the much larger OTC than on the CME. *See* Tr. at 151. Moreover, the evidence demonstrated that the bulk of Bear Stearns's purchases of Kwiatkowski's positions occurred during the last 30 minutes of trading on the exchange,[43] a pattern likely to raise the visibility of the transactions and enable floor traders to take advantage of it to the detriment of the customer.[44] Sabini stated, however, that no one at Bear Stearns apprised him of this negative consequence while he was executing the trades by which Kwiatkowski amassed his 65,000 contracts all on the CME. *See* Tr. at 163–65. While Sabini asserted that Kwiatkowski had insisted on placing his entire position in a regulated exchange, it appears that it was not until he and Bear Stearns executives were contacted by the CME and federal regulators about the size of Kwiatkowski's holdings that Bear Stearns responded by urging Kwiatkowski to shift his position to the OTC.

On this record, a jury could reasonably find that Bear Stearns left Sabini, a securities broker and not an expert on foreign currency trading, virtually unsupervised by more senior Bear Stearns managers, as he enabled his customer to assume a position of unprecedented proportions in foreign currency futures entirely on the CME. The jury also could have found that

Sabini did so without conducting suitability and risk analysis and without seeking more informed assistance from his own firm's professionals who could have alerted him to some of the financial exposure Kwiatkowski's trading engendered. Under the standards discussed above, failure to supervise a broker's activities adequately, has been recognized by courts as grounds to support a finding of breach of the duty of reasonable care. *See Zagari*, 1976 WL 838, at *14 ("Similarly, the obligation of brokerage houses to supervise properly their employees' accounts and actions is provided for under common law doctrine of respondeat superior."). Moreover, these events raised issues as to whether Bear Stearns officials exercised the degree of skill and prudence expected of a broker acting under the same circumstances. *See Thropp*, 650 F.2d at 820.

### 2. *Monitoring the Accounts*

The evidence raised questions as to Bear Stearns's compliance. with its own internal procedures and guidelines also in relation to the extent of and responsibility for monitoring Kwiatkowski's accounts. Kondratowicz testified that the compliance function he had performed in connection with Kwiatkowski's foreign currency account prior to November 1994 was removed from him and taken over by the Executive Committee and other senior managers. While Cayne indicated that as many as 20 Bear

---

**43.** On this point, the experts expressed sharply contrasting opinions. DeRosa characterized this practice as a form of advertising that rendered the transaction "an easy mark ... You're putting a neon sign on your back to whatever you're doing." Tr. at 1447. The risk, DeRosa testified, inhered in that "[a]nything that leaves a trail ... on the floor of that exchange is your death warrant.... They know these things. They're watching for these things. You see a guy go into the pit from the same firm and almost every day at a certain time, he's out there scooping up thousands of contracts. You know he's going to be there tomorrow. You see him coming. You buy ahead of him. It's common sense ...." Tr. at 1446. Weir, on the other hand, discounted any particular risks associated

with trading at the end of the day. In his view, this practice was just another strategy, and there are as many trading strategies as there are people trading. *See* Tr. at 1967; 2041.

**44.** Sabini testified that Ronald Hersch, head of Bear Stearns's Futures Department, and Paul Friedman, a Senior Managing Director, had discussed Kwiatkowski's method of trading predominantly at the end of the day just before market closing. They felt the practice was more likely to be noticed by floor traders who would take advantage of it, having the effect of causing the customer losses in the millions of dollars on a position as large as Kwiatkowski's. *See* Tr. at 163–65.

Stearns officials were involved in various aspects of inquiry to ensure that Bear Stearns was protected from financial exposure related to Kwiatkowski's account, the evidence left in doubt whether any one Bear Stearns officer was in charge of oversight to ensure that, to the extent applicable under Bear Stearns's procedures, Kwiatkowski's accounts were properly handled with respect to compliance, including whether to inform Kwiatkowski of any higher risks associated with his foreign currency investments as market conditions changed adversely to his position. *See* Tr. at 964.

In fact, Kondratowicz testified that under his reading of Bear Stearns's internal procedures and guidelines, if the account officer becomes aware of significant changes in the customer's ability to maintain his commodity account "[h]e should advise his customer to cut down his positions to lower his risk in the market." Tr. at 1358. He added that from what he knew, Sabini never advised Kwiatkowski to do so. *See* Tr. at 1359.

### 3. *Optimistic Assessments*

The evidence suggested that at a number of critical moments, Bear Stearns officials conveyed to Kwiatkowski encouraging market assessments, opinions and assurances that may have been overly optimistic or unrealistic under the circumstances and that could result in augmenting losses if relied upon by a customer. For example, in conveying the advantages of moving his foreign currency contracts from the CME to the OTC, Schoenthal allegedly assured Kwiatkowski that, should anything go wrong with his account in the OTC, Schoenthal could get him out "on a dime". *See* Tr. at 502.

Schoenthal testified, however, that in a declining market, getting out of a large

foreign currency position in a short time, even on the OTC, could result in large losses (*see* Tr. at 1132–33), a view endorsed by DeRosa. *See* Tr. at 489. Angell, during the conference call with Kwiatkowski and Sabini following Kwiatkowski's loss of $100 million on January 9, 1995, allegedly expressed confidence in the dollar and suggested that the market would rebound, even at a time when Bear Stearns's own futures market forecasts were downgrading the outlook for the dollar to negative.[45] Such unwarranted expressions have been found in particular situations to weigh among the grounds that under given circumstances may sustain a finding of a broker's breach of the duty of reasonable care. *See Walker,* 930 F.2d 29, 1991 WL 42938 at *2–3.

### 4. *The Negative Forecasts*

The evidence demonstrated that Sabini may have failed in February to inform Kwiatkowski about Bear Stearns's changed negative forecasts for the dollar. Sabini asserted that he regularly talked to Kwiatkowski as many as 20 to 30 times a day, and to Themistocleous three to four times a day, in those conversations conveying a broad spectrum of financial information drawn from diverse sources that might affect Kwiatkowski's position. He also acknowledged that in both September 1992 and November 1994, he had placed Kwiatkowski in touch with Bear Stearns's chief economist and also conveyed Bear Stearns's bullish materials touting trading opportunities for the dollar.

By contrast, Sabini testified that, during the almost two month period from January through February 1995, while the dollar continued a steady decline reaching a near free fall by early March, he had no recollection of having transmitted to Kwiatkow-

**45.** Sabini testified that even though Kwiatkowski had lost $100 million that day, he did not inform Angell prior to their conversation with Kwiatkowski that at that point Kwiatkowski had a position of 65,000 contracts valued at $6.5 billion, all long on the dollar.

*See* Tr. at 191–92. Asked whether "you approached anyone from Bear Stearns and said, I have a problem here, I have a customer who I think is maybe over-exposed, he's contemplating closing his positions, he needs some help?", Sabini responded "No." Tr. at 192.

ski, or discussed with him, reports prepared by Bear Stearns's currency market experts in January and February 1995 conveying a revised outlook downgrading their forecast for the dollar to negative. *See* Tr. at 258. At the same time, Bear Stearns's analysts' monthly market publications projected the greatest strength, relative to the U.S. dollar, for the Swiss franc and German mark, the two currencies in which Kwiatkowski still held short positions. *See* Tr. at 207–08. Kwiatkowski, however, categorically denied that he was informed of the change in Bear Stearns's perspective,[46] and asserted that had he been apprised he would have closed his position. *See* Tr. at 511–13.

On this point, the evidence suggests that there may have been a change as well in Sabini's role and attitude in handling Kwiatkowski's accounts during this period. Sabini testified that after the major decline in the market on December 28, 1994, when Kwiatkowski suffered a loss of $112 million, he was on the phone with Kwiatkowski for three hours from 12:00 p.m. to 3:00 p.m. "trying to a ascertain by any news, we were calling everyone trying to get a reason for the pressure that was being put on the dollar." Tr. at 185. Among the people with whom Sabini put Kwiatkowski in contact was Schoenthal, who ascribed the market drop to seasonal liquidity. Similarly, following the market drop on January 9, 1995, Sabini arranged for the conference call with Angell and Kwiatkowski, and at about the same time met with Themistocleous to express concern about the size of Kwiatkowski's position and urge him to press Kwiatkowski to reduce it.

But after this point, Sabini indicated, he never again discussed with Kwiatkowski or Themistocleous or anyone else at Bear Stearns the advisability of Kwiatkowski's closing out his position. *See* Tr. at 192; 197–98. In fact, in late January 1995, Schoenthal had conversations directly with Kwiatkowski, not through Sabini as had been the regular practice up to this period. They discussed Kwiatkowski's Japanese yen position, after which Kwiatkowski ordered a substantial reduction in his yen holdings. *See* Tr. at 194–95. Sabini was not part of these conversations and was not told by Schoenthal about them. *Id.* During the period from late February 1995 through the liquidations on March 3–6, Schoenthal personally assumed control over the transactions in Kwiatkowski's foreign currency account. Sabini agreed that Schoenthal "became involved at this time because everyone wanted to make sure that since there was a major problem with the account that what was being done was done right." Tr. at 209.

Thus, whereas Schoenthal testified that in December 1994, when he was recommending that Kwiatkowski transfer his foreign currency position from the CME to the OTC, his "immediate concern was making sure this person had our best information" (Tr. at 1144), the evidence suggests that by the end of February 1995 a question of fact arose as to whether Bear Stearns, during a period when Kwiatkowski's foreign currency account was experiencing what Sabini called "a major problem", actually provided Kwiatkowski with its "best information." This factual issue extended to whether Bear Stearns then regarded as the firm's most immediate concern the protection of its margin, to the exclusion of reasonable consideration of whether the customer was served with the

---

**46.** On this matter, Kwiatkowski testified:

Q. During this period of time, from, say, mid January to mid February 1995, did Mr. Sabini or anybody else at Bear Stearns even tell you that Bear Stearns' foreign currency experts had changed their opinion of the dollar's prospects?

A. No.

Q. During this period did either Mr. Sabini or anybody else at Bear Stearns even tell you that Bear Stearns' foreign currency experts had become optimistic about the Swiss franc and the German mark and had become pessimistic about the dollar?

A. No.

Tr. at 511–12.

firm's best information at the time potentially important to his investment options.[47]

This evidence raised questions as to whether Bear Stearns's performance fully satisfied the duties of a reasonable broker even under the basic standards of the ordinary broker/customer relationship defined by agency principles. Under § 381 of the *Restatement (Second) of Agency*, the agent is subject to a duty "to use reasonable efforts to give his principal information which is relevant to affairs entrusted to him and which, as the agent has noticed, the principal would desire to have." Putting aside the larger issue of whether Bear Stearns had undertaken larger advisory functions in handling Kwiatkowski's accounts—a finding the evidence could reasonably support—Sabini's failure to inform Kwiatkowski of Bear Stearns's changed forecast for the dollar at a time when Kwiatkowski's position was being battered by a volatile market, and in contradistinction to Sabini's diligence in communicating to Kwiatkowski Bear Stearns's bullish projections in the fall of 1994 when Kwiatkowski's position was being acquired, could be regarded as a breach of the broker's obligation to provide the customer with essential information relevant to the affairs entrusted.

There could be no dispute that, given the magnitude of Kwiatkowski's position, the attendant risks and the market conditions then prevailing, as Kwiatkowski testified, a dramatic shift of opinion by Bear Stearns's foreign currency experts directly touching on his investment was an essential item of information Kwiatkowski "would desire to have." *See Restatement (Second) of Agency* § 381. If Sabini in fact did not share this material with Kwiatkowski, it would have represented a notable departure from what he himself testified he routinely conveyed to Kwiatkowski during their extensive daily conversations and in the normal course of his broker/client duties. According to Sabini, among the sources he surveyed every day and reviewed with Kwiatkowski for matters that might pertain to his accounts was "any information from Bear Stearns which would come in normal distribution." Tr. at 233–34. Bear Stearns's monthly Global Futures Marketing Strategies, a copy of which Sabini transmitted to Kwiatkowski in November 1994 with bullish projections, would qualify as information in normal distribution no less so when the analysis and forecasts reported were negative to Kwiatkowski's holdings.

Whether, as a matter of standards and practice in the securities industry, a broker would be obligated to convey the type of market forecasts and warnings in question was a subject of major contention and sharply divided expert testimony.[48] Nonetheless, Bear Stearns's expert, while asserting that there existed no general obligation for a broker to provide all research or consistent research, acknowledged that "the idea is to provide the best information possible to serve your client in the best way you can providing them with the information that you think is important to them". Tr. at 1953. And whether Bear Stearns, through Sabini or the other officers communicating with Kwiatkowski in late January and February 1995, by not apprising Kwiatkowski of the firm's changed forecast for the dollar to negative, was providing the best information it had

**47.** Both Cayne and Schoenthal stated explicitly that Bear Stearns's paramount concern during this period was protecting itself from losses. *See* Tr. at 994–95; 1356–57; 1165–66.

**48.** DeRosa testified that it would be consistent with industry practice for a broker under these circumstances to provide the customer with negative forecasts regarding the dollar such as those Bear Stearns produced in February and March of 1995 and to notify the customer if the firm radically changes its position. *See* Tr. at 1483–87. By contrast, Weir asserted that there is no such requirement in industry custom or practice. But even under Weir's formulation, the test whether Sabini's conduct complied with industry norms was: "Did he do his best to provide the information that he thought was important to Mr. deK and did he exercise a reasonable degree of care in doing that." Tr. at 2080.

and was thus serving its client in the best way with information important to him, presented a factual dispute the jury could reasonably have resolved on the basis of the credibility and weight it accorded to the respective opinions in evidence. *See Restatement (Second) of Agency* § 381.

### 5. *Rising Risk to the Securities Accounts*

In mid-February 1995, Kwiatkowski responded to a margin call by authorizing Bear Stearns to liquidate positions rather than transmitting cash to pay the debt. During the Presidents Day weekend of 1995, Bear Stearns executives, concerned that the dollar would fall sufficiently to render Kwiatkowski's account undermargined and place Bear Stearns at risk, prepared to take action to liquidate Kwiatkowski's account if the market declined to a point which gave rise to that prospect. *See* Tr. at 1060; 202–03. Following an uneventful weekend, Bear Stearns called for Kwiatkowski to put up more collateral and was informed, according to Kwiatkowski, that he had no money to do so. Thus, for the first time in their relationship, Kwiatkowski ordered liquidations of his position to pay margin calls.

At this point, Bear Stearns was effectively placed on notice that Kwiatkowski's means of future payment of margin debts may be more liquidations and ultimately the collateral in Kwiatkowski's Security Account. *See* Tr. at 198–203.[49] Sabini testified that, despite what Bear Stearns's economic analysis demonstrated, he never considered the relatively greater risk to Kwiatkowski's accounts nor discussed with anyone during his time whether Kwiatkowski's meeting margin calls by liquidating positions increased his risk profile. *See* Tr. at 201. These circumstances raised additional disputes regarding the adequacy of compliance with Bear Stearns's internal procedures and industry standards and practices relating to risk assessment for customers as market and account conditions materially change.[50]

### 6. *The Liquidation*

Bear Stearns did not seek to liquidate Kwiatkowski's position on March 1, 1995 because on that date the accounts still contained enough collateral to support what remained of Kwiatkowski's original foreign currency holdings. On the morning of March 3, however, the value of the dollar experienced another fall. Concerned that Kwiatkowski's accounts would become undermargined, Bear Stearns undertook some liquidations even before Kwiatkowski could be reached for authorization. *See* Tr. at 1064. When contacted later in the morning, Kwiatkowski expressed interest in further lessening or closing his foreign currency position and was dissuaded by Schoenthal's view that the markets effectively close by noon on Friday, and that it would be unwise to attempt additional sales in a market with such low liquidity. With Kwiatkowski's concurrence, Schoenthal postponed further liquidations until Sunday, March 5.

There was substantial disputed testimony among the parties and their experts as to whether Bear Stearns's decision to put off the liquidation on these occasions reflected the most prudent course, and as to the extent to which the strategic choices Bear Stearns made in this regard worked to Kwiatkowski's detriment. DeRosa took issue with Schoenthal's view that the foreign currency markets close by noon New York time, noting that during the balance of the afternoon, markets are still open in other major cities in the United States and

---

**49.** However, at about the same time, Kwiatkowski on two occasions wired funds to pay large margin calls: $20 million on February 14 and $70 million on February 15, 1995. *See* Tr. at 1901.

**50.** DeRosa contended that under industry practices a broker should disclose a growing risk as necessary and appropriate when conditions change. *See* Tr. at 1458–59. Weir disagreed that there was such a custom or practice in the futures and commodities business. *See* Tr. at 1903.

Canada. *See* Tr. at 1192. DeRosa also testified that the greatest liquidity for foreign currency transactions prevails during times when both the London and New York markets are open. Conversely, he asserted, the most inauspicious time and place to conduct business, because trading of large positions in small markets could force prices downward, is in the markets of New Zealand and Australia when they open on Sunday at 3:00 p.m. New York time, the very course Schoenthal had chosen to pursue.[51] In fact, during the March 5 liquidation, Schoenthal became concerned that his trades on behalf of Kwiatkowski were contributing to the further decline of the dollar. *See* Tr. at 1170. These disputes raised factual issues for the jury to resolve as to whether the choices Bear Stearns officials made under these circumstances indicated the exercise of the degree of prudence and skill expected of a broker acting under similar conditions.

### 7. *Summary/Conclusion*

In summary, the trial demonstrated special circumstances prevailing in this case to provide support, on three separate legal bases, for a jury determination that Bear Stearns breached its duty to exercise reasonable care in the firm's relations with Kwiatkowski during the relevant times and events here at issue. First, sufficient evidence was presented indicating that notwithstanding that Kwiatkowski's accounts with Bear Stearns were nondiscretionary, Bear Stearns assumed and performed substantial advisory functions in connection with the affairs Kwiatkowski entrusted to the firm during the course of their relationship. Second, even absent any obligation to perform enhanced advisory responsibilities, in several critical respects,

the firm's performance could be found short of fulfilling its duties to inform of important matters falling within the scope of the broker/client relationship that had developed between the parties.

And third, even if Bear Stearns had had no standing obligation to render any information or advisory service to Kwiatkowski, under the exceptional conditions that prevailed here, with Kwiatkowski caught in a position fraught with financial peril, Bear Stearns undertook efforts to respond by providing some assistance. But a rational jury could find that, in the ways already described, the actions Bear Stearns pursued or omitted failed to measure up to what the circumstances objectively demanded of a reasonably prudent broker encountering the same events. In particular, a jury could find that, to the extent Bear Stearns did assume some responsibilities for dealing with Kwiatkowski's accounts, under special circumstances the manner in which it discharged them may have made matters worse for Kwiatkowski in some respects.

To argue in the face of these extraordinary circumstances that the only duties that the parties' relationship and the overall situation engendered and that Bear Stearns assumed during the course of ensuing events were merely ministerial—mechanically to execute transactions only as and when directed by Kwiatkowski and to provide transaction confirmations and regular account statements—would be tantamount to divorcing rule from reality, in effect disassociating the application of law from the operative facts that brought about the parties' dispute. Such a course would severely understate what the jury

---

**51.** DeRosa's testimony on this point was as follows:

> Q. When—where is the time and place during the week when you're most likely to create a panic by engaging in a major foreign currency transaction?
>
> A. New Zealand, Australia, 3 p.m. New York time. They're open and no one else is. They can only trade among themselves.

There aren't many of them, good place to start a riot.

Tr. at 1435. Weir asserted that there is no industry custom or practice favoring liquidation on Friday, adding that other factors may come into play on the choice of timing and markets, including the customer's prior course of dealings and potential risk to the firm. *See* Tr. at 1965.

could reasonably find was the truth underlying the parties' actual business links and would give an aura of abstraction and generality to circumstances that were anything but commonplace.

At trial, and with these motions, Bear Stearns sought to portray Kwiatkowski's motivations in assuming the massive risk he chose as those of a person driven by ego gratification, exuberant greed or just reckless gambling thrills.[52] The record in fact is clear that, throughout the times and circumstances relevant here, Kwiatkowski was a sophisticated investor and that he was fully aware of the large risks associated with foreign currency trading and with his exceptionally large position. He admitted as much. *See* Tr. at 558. But Kwiatkowski's ambitions, while perhaps a consideration that might have been relevant to mitigation of Bear Stearns's culpability, are not at issue here and should not distract from what is. The fact is that, regardless of the forces, the means and the self-conduct that may have impelled Kwiatkowski to place himself at extreme financial risk, in early 1995, he was caught in extraordinary circumstances imbued with financial peril and portending substantial loss, not only to Kwiatkowski, but to Bear Stearns and potentially to many other investors in the financial markets.

A reasonable jury could find that, whatever choices Kwiatkowski's ultimately made, in material ways his relationship to Bear Stearns, the firm's dealings with him and the manner in which it handled his accounts, also had some causal relation, if not initially in creating, at least in augmenting Kwiatkowski's position of financial danger and contributing to his consequential loss. In the final analysis, whether Bear Stearns's acts or omissions indeed were culpable under the circumstances was decided by the jury applying the standard of reasonable conduct that pertained

to the situation—the measure by which the behavior of a reasonable broker confronting similar conditions is to be judged.

### E. *Mixed Verdict*

■ Bear Stearns also argues as grounds for a new trial that the jury's seemingly inconsistent mixed verdict—finding Bear Stearns negligent but exonerating Sabini—provides further evidence that the determination was "confused and unjust," given that it was through Sabini that nearly all of the alleged advice and other Bear Stearns conduct at issue would have occurred. This argument overlooks what the evidence summarized above substantiates: that Sabini was not the only Bear Stearns employee who had a significant role in handling Kwiatkowski's accounts during the critical period between November 1994 and March 6, 1995, or who communicated with Kwiatkowski, directly or through Sabini, in connection with the events in question.

Second, the breach of care Kwiatkowski claims is not limited to the alleged advice given or not given by Sabini, but to the firm's overall dealings with him and its handling of his accounts, a role that involved many Bear Stearns managers, including executives in the firm's highest echelons. Third, whatever the jury may have ruled as regards Sabini, Bear Stearns would be liable for its conduct in not providing proper supervision and monitoring, through actions or omissions of employees other than Sabini who bore those responsibilities. These circumstances provide sufficient basis by which the jury's general verdict, even if it appears inconsistent, may be reasonably harmonized with a theory consistent with a fair reading of the evidence. *See McGuire v. Russell Miller, Inc.,* 1 F.3d 1306, 1311 (2d Cir.1993) ("The court must search for a reasonable way to

---

52. Sabini testified that at one point he suggested to Kwiatkowski, who wanted to enlarge the size of his positions, that the timing was not right and that he could possibly lose a lot of money. Kwiatkowski's reply, according to Sabini, was: "It didn't give me a thrill." Tr. at 1653. Asked why he did not liquidate in January 1995 after his $100 million loss, his answer was "I'm not the running type." Tr. at 876.

read the verdicts as expressing a coherent view of the case ... and if there is any way to view a case that makes the jury's answers to the special verdict form consistent with one another, the court must resolve the answers that way even if the interpretation is strained.").

### F. Scope and Determination of the Duty of Care

 Bear Stearns not only denies that it owed Kwiatkowski any duty in this case, it further maintains that the Court erred in its instructions because the Court did not resolve the threshold question of the existence of a duty of care, thereby allowing the jury to decide what Bear Stearns was legally obligated to do and what duties it breached. *See* Defendants' Memorandum at 14. In essence, Bear Stearns objects that even if the firm had some legal duty of care, the charge to the jury did not articulate Bear Stearns's particular responsibilities attendant to that duty. Related to this argument, Bear Stearns notes that the jury rendered a general verdict, and that absent a special verdict specifying the detailed basis for the jury's determination of liability, the award cannot be sustained if any portion of it may have been grounded on a theory of recovery for which no legal support exists. *See id.* at 5.

At its crux, Bear Stearns's argument contains two points. The first goes to the scope of the duty of due care, and the extent to which whatever the duty demands under any given circumstances must be precisely particularized for the jury, so that if a general verdict were disaggregated each discrete component of it must find sufficient basis on some independent legal ground. The second issue is to what extent the Court must perform that fact-specific duty inquiry and set it forth in the instructions, rather than leaving to the jury some latitude within given parameters and standards to infer breach of duty of reasonable care from all of the circumstances in evidence.

Bear Stearns cites authority for the proposition that if a general verdict may rest on separate legal grounds, it could not be sustained if any one of the distinct bases is deficient. *See Katara v. D.E. Jones Commodities, Inc.,* 835 F.2d 966, 970–71 (2d Cir.1987); *see also Bruneau v. South Kortright Cent. Sch. Dist.,* 163 F.3d 749, 759 (2d Cir.1998), *cert. denied,* 526 U.S. 1145, 119 S.Ct. 2020, 143 L.Ed.2d 1032 (1999); *O'Neill v. Krzeminski,* 839 F.2d 9, 12 (2d Cir.1988); *Morrissey v. National Maritime Union,* 544 F.2d 19, 26–27 (2d Cir.1976). This doctrine applies to separate theories of liability that may be incorporated in a general verdict, each one of which may depend upon different prerequisites to establish the elements necessary to state a sufficient claim. The principle is thus inapposite here.

What Bear Stearns actually challenges in this case are not discrete legal *theories* of recovery, but the *factual* basis for the verdict. In this respect, as already discussed, as regards Kwiatkowski's negligence claim, the jury instructions contained one unified theory of recovery, a single duty that allegedly was breached— the duty of due care—rather than four legal duties supporting conceptually distinct statements of liability. Consequently, the real issue at this point is whether the scope of the duty of care could encompass, as part of the factual basis for the jury's determination, Bear Stearns's conduct in providing or failing to provide the particular information or advice at issue.

The answer to this question is already implicit in the discussion of the concept of the legal duty of reasonable care elaborated above. In this connection, it is worth noting, that "duty" is a question of whether the defendant in a case is under any obligation to the particular plaintiff. As Professor Prosser has stated on this point, "in negligence cases the duty is always the same—to conform to the legal standard of reasonable conduct in the light of the apparent risk. What the defendant must do, or must not do, is a question of the stan-

dard of conduct required to satisfy the duty." *Prosser* § 53 at 356. Professor Prosser adds that duty "is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." *Id.* at 358.

Bear Stearns asserts that both the existence and the scope of a legal duty are matters to be determined by the judge rather than by the jury, and that a jury's verdict cannot establish a duty that does not exist at law. *See* Defendants' Memorandum at 6. This proposition and the supporting authority Bear Stearns cites for it are undisputable. *See Alfaro*, 210 F.3d at 113 (quoting *Waters v. New York City Housing Auth.*, 69 N.Y.2d 225, 513 N.Y.S.2d 356, 505 N.E.2d 922 (1987)) ("The question of the existence and scope of an alleged tortfeasor's duty is, in the first instance, a legal issue for the court to resolve."); *Palka*, 611 N.Y.S.2d 817, 634 N.E.2d at 192 (the definition and scope of a tortfeasor's duty "is usually a legal, policy-laden declaration reserved for judges to make prior to submitting anything to fact-finding or jury determination"); *Prosser* § 37 at 236.

The existence of a legal duty in this case, however, in fact was determined by the Court. The applicable standard the Court. instructed the jury to use in weighing the facts was the duty of due care, an obligation imposed by law on every person, including brokers in relation to their clients, to exercise ordinary, reasonable care to avoid injury to others. Thus, the jury was not charged to apply on an ad hoc basis a new or enlarged duty that does not already exist. *See Alfaro*, 210 F.3d at 115; *Stagl*, 52 F.3d at 469. What the jury was instructed to do was to consider whether in the course of Bear Stearns's dealings with Kwiatkowski and the handling of his accounts—considering the factual disputes concerning instances of alleged advice or information Bear Stearns offered or did not offer as adjuncts and examples of the firm's overall performance as brokers— Bear Stearns's performance did or did not satisfy the stated duty of care.

An antecedent to that instruction was the Court's determination, in allowing the negligence claim to go to the jury as described in the instructions, that to the extent there existed any obligation on the part of Bear Stearns to provide the disputed services in a reasonable manner, that obligation arose out of the parties' existing relationship as actually manifest by their dealings and conduct and the performance of services Bear Stearns actually assumed to render. The evidence demonstrated that the dealings between the parties exceeded the scope of the ordinary broker/client relationship, as did the affairs entrusted in the course of that relationship. Moreover, the record sustains a finding that Bear Stearns actually undertook to provide Kwiatkowski substantial investment information and guidance in accordance with what a reasonable jury could find comprised more than collateral advisory services offered from time to time. Thus, unlike the circumstances that pertained to the plaintiff in *Alfaro*, Kwiatkowski specifically asserted that Bear Stearns undertook to render advice and did so in a manner not reasonable under the circumstances. The jury could also find the evidence here to establish that the course of the parties' business relationship and dealings demonstrated Bear Stearns extended assistance of a specific type. *Cf. Alfaro*, 210 F.3d at 115 n. 2.[53]

The full scope of the duty of reasonable care—just what a defendant is required to do to discharge its legal obligation under

---

**53.** The Second Circuit noted: "In light of the facts of this case, we need not, and do not, decide whether a store's failure to provide timely assistance of a specific type to a customer could give rise to a negligence action under New York law if the customer had requested that specific type of assistance or had informed a store employee that he required that specific type of assistance, or if an employee had seen the customer attempting to help himself in a manner likely to cause injury." *Id.*

any given circumstances—is nowhere precisely codified. While the New York Court of Appeals in *Palka* instructed that the determination is a "policy-laden declaration" reserved for the court, it also noted that "[c]ommon-law experience teaches that duty is not something derived or discerned from algebraic formula." 611 N.Y.S.2d 817, 634 N.E.2d at 192. Rather, the Court elaborated, duty "coalesces from vectored forces" which contribute to "pinpointing and apportioning of societal risks and to an allocation of burdens of loss and reparation on a fair, prudent basis." *Id.* On this premise, the Court of Appeals recognized that the duty inquiry entails not only the wrongfulness of a defendant's conduct, but also "an examination of an injured person's reasonable expectation of the care owed and the basis for the expectation and the legal imposition of a duty." *Id.* (citing *Turcotte v. Fell*, 68 N.Y.2d 432, 510 N.Y.S.2d 49, 502 N.E.2d 964, 967 (1986)). To the same effect, Professor Prosser observed that within "undefined general limits, it may be said that the courts have merely 'reacted to the situation in the way in which the great mass of mankind customarily react,' and that as our ideas of human relations change the law as to duties changes with them." *Id.* § 54 at 359 (quoting Bohlen, Book Review of Green, *Judge and Jury*, 80 U. Pa. L.Rev. 781, 785 (1932)).

What this Court endeavored here is what many other courts have done in weighing whether and how finely to parse the duty instruction for the jury: to the extent permissible to avoid engaging in "fact-specific duty analysis". *See Stagl*, 52 F.3d at 469; *Havas v. Victory Paper Stock Co., Inc.*, 49 N.Y.2d 381, 426 N.Y.S.2d 233, 402 N.E.2d 1136 (1980). As Professor Prosser instructed: "Where there is so much dispute among lawyers [concerning the scope of the duty of care] the court should be rather slow to take the case from the jury." *Prosser* § 43 at 288.

This course recognizes that juries in civil disputes routinely apply a generalized standard of reasonable care in adjudicating whether a particular form of conduct did or did not comport with community norms extant at a given moment. Not surprisingly, therefore, in determining liability, juries generally do not possess a court-drawn blueprint instructing them in minute detail whether, where and when every particular fact pattern crosses the culpability line. *See Berkey Photo, Inc. v. Eastman Kodak Co.*, 457 F.Supp. 404, 438 (S.D.N.Y.1978), *aff'd in part, rev'd in part on other grounds*, 603 F.2d 263 (2d Cir. 1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980).

Rather, in the course of discharging their responsibilities, juries necessarily must bring to bear, often with far-reaching consequences, their own common sense upon aspects of broad legal concepts of right and wrong—such as due care, reasonableness, bad faith, recklessness and intent—that, beyond certain practical limits, may be incapable of further meaningful reduction into predetermined definition and guidance. Such common judgments on given factual issues are uniquely within the jury's purview. Inherent to their vital functions, juries serve as microcosms of society and as sounding boards of common values. The jurors' ability to perform their constitutional tasks in the administration of justice would be unduly constrained, and the value of their role would be consequently curtailed, were they not permitted, except upon graphic, code-like instructions precisely itemizing prescribed fact patterns, to press into service their general understanding of relevant community standards and values.

That there can be no pattern jury instruction specifying in advance the metes and bounds of all factual arrangements fixing what in many tort actions constitutes due care at a given moment has been acknowledged by the New York Court of Appeals. In *Havas*, the Court declared that it was particularly appropriate to leave the issue of whether defendants failed to exercise due care to the jury

not only because of the idiosyncratic nature of most tort cases, or because there was room for a difference in view whether [defendant's] conduct in the particular circumstances of this case did or did not evidence lack of due care, but, perhaps above all, because, in the determination of issues revolving about the reasonableness of conduct, the values inherent in the jury system are rightly believed an important instrument in the adjudicative process.

*Havas*, 426 N.Y.S.2d 233, 402 N.E.2d at 1139 (citations omitted).

While the jury instructions here did not possess a manual of particulars detailing precisely what specific conduct, beyond those articulated by the Court, constituted a breach of the duty of reasonable care does not mean that the jury undertook its charge rudderless and without reference points to chart its course to a proper adjudication of the facts in dispute. As discussed above, the jury was instructed that Kwiatkowski's theory of negligence was that Bear Stearns did not exercise the due care of a reasonable broker under the same circumstances in its dealings with him. The instructions then listed four specific examples by which Kwiatkowski alleged Bear Stearns breached that duty. The arguments and corresponding evidence presented at trial, however, demonstrated extensively other conduct relevant to Bear Stearns's "dealings" with Kwiatkowski from which a reasonable jury could infer failure to discharge the duty of due care in a reasonable way.

Drawing inferences in Kwiatkowski's favor, as the Court must on a motion under Rule 50(b), the jury in sustaining its verdict could have found sufficient support in those other grounds in addition to or in lieu of the particular examples Kwiatkowski alleged and the Court's instructions cited by way of illustration. Similarly, independently weighing the two sides' evidence against each other, the Court does not consider the verdict to have been clearly erroneous for the purposes of a new trial under Rule 59(a).

Moreover, the jury was charged that it could take into account as one measure of reasonable conduct industry rules and practices as well as Bear Stearns's internal procedures introduced in evidence as standards of what may define the duty of due care under given circumstances. As discussed above, in numerous cases, these practices have been deemed relevant considerations in the determination of liability for failure to exercise due care. The parties' evidence here differed significantly in this regard, both as to whether the standards applied at all and whether in fact Bear Stearns's handling of Kwiatkowski's accounts conformed to industry norms and to Bear Stearns's own internal guidelines. *See* discussion, V.D.1, *supra.*

Thus, whether the duty of reasonable care should have encompassed an obligation to provide the information, advice and risk warnings in Bear Stearns's dealings with Kwiatkowski and its handling of his accounts under the exceptional circumstances here, was a legitimate factual issue for the jury to decide. The advice and warnings in question were not free-standing, isolated items unrelated to any pertinent connection between the parties. Rather, the disputed information could reasonably be viewed as a vital component in the total mix of the special circumstances that encompassed the parties' business relationship, their prior dealings in connection with the transactions which are at the center of the controversy, and, in particular, Bear Stearns's continuous role in the events that formed integral links in the causal chain.

G. *The Court's Conclusion*

On the basis of this review and analysis of the trial record, the Court is satisfied that, in examining the evidence, resolving doubts and drawing reasonable inferences in a light most favorable to the opponent of the motions, a legally sufficient evidentiary basis exists for a reason-

able jury to find for Kwiatkowski. The Court cannot find here that the jury's verdict could only have been the product of sheer surmise or conjecture, or that Bear Stearns presented such a disproportionately overwhelming amount of evidence favoring its defense that no reasonable and fair-minded person could have ruled against it. *See Argenti,* 155 F.3d at 120; *Concerned Area Residents,* 34 F.3d at 117. Accordingly, the Court concludes that there is insufficient ground to grant Bear Stearns's Rule 50(b) motion for a judgment as a matter of law. Similarly, evaluating the evidence independently in the context of the less rigorous Rule 59(a) considerations, on the record before it, the Court is not convinced that the verdict the jury reached is "clearly erroneous" or represents a miscarriage of justice. *See Katara,* 835 F.2d at 970. For this reason, the Court also denies Bear Stearns's Rule 59(a) motion for a new trial.

## VI. *POLICY CONSIDERATIONS*

Finally, Bear Stearns cites policy considerations in demanding a reversal of the verdict or a new trial. It urges that a rule imposing the duty it alleges the jury's award here would place on brokers would have "radical and regrettable implications for the brokerage industry and its customers." Defendants' Memorandum at 11. Noting that, as a business practice for the benefit of customers, brokers routinely provide them investment information and incidentally may even render advice from time to time, Bear Stearns contends that to burden securities firms with potential liability for failing to furnish clients with all arguably pertinent investment materials would deter brokers from offering services beyond execution trades and expose them to potentially ruinous, insurer-like liability. This danger, the argument holds, inheres particularly in volatile and risky markets such as those in foreign currency futures, because every customer who loses money in an investment could claim that, but for something the broker knew but did not disclose to the client about a security, or about the industry or the general economy, he would not have suffered the loss. *See id.* at 11–12. In support, Bear Stearns quotes at length from *Robinson.*[54]

This contention raises weighty considerations which cannot be minimized. As formulated by Bear Stearns, the argument merits a judicial response equal to the gravity of its implications. In fact, the Court has already addressed the points raised by these policy concerns. In light of Bear Stearns's urging that the verdict here and the Court's ruling on these post-trial motions entail matters of significant public interest beyond those of the parties to the case before the Court, however, it is worth summarizing the reasons why, under the circumstances and legal determinations peculiar to this action, the dire apprehensions for the securities industry Bear Stearns projects are neither well-grounded nor likely to materialize.

First, as the contextual qualifier that Bear Stearns's excerpt from *Robinson* itself expresses, under the facts decisive in

---

**54.** *See Robinson,* 337 F.Supp. at 112–13:

> If a broker were under a duty to inform all of its customers of every fact which might bear upon any security held by the customer, the broker simply could not physically perform such a duty.
>
> The complexity and variety of the factors affecting price are so great that any attempt to cast upon the broker the duty to determine, at his peril, which facts are relevant to each customer in each commodity would make the broker an insurer for the trader. Clearly the relationship was not intended as such.

> To make this defendant or any other broker the guardian of a customer such as the plaintiff would recover damages from his broker merely by proving non-transmission of some fact which, he could testify with the wisdom of hindsight, would have affected his judgment had he learned of it.
>
> Under these circumstances any continuing duty to furnish all price information and information of all facts likely to affect the market price would be so burdensome as to be unreasonable, and neither logic, reason nor common sense would impose such a continuing duty.

that case: "There was no pleading or proof of an express contract *or special circumstances* which required defendant to transmit to plaintiff the extrinsic facts or opinions in any way related to the market in question." *Robinson*, 337 F.Supp. at 112. Thus, the *Robinson* court itself acknowledges at the outset that, under a fact pattern different from that which was plead there, "special circumstances" could prevail that might remove the case from the application of the general rule.

Implicitly, the *Robinson* court recognized that when a unique situation may appropriately demand it, not as a standing matter of contractual or agency responsibility but as an aspect of the duty of due care under the circumstances, an obligation could be imposed on a broker to supply particular information to a customer. To the extent the concerns in *Robinson* properly relate to imposing extraordinary burdens on an ordinary broker/client relationship and associated dealings, those fears do not reflect the exceptional circumstances the evidence demonstrated underlie the case before this Court. Here, as the Court has endeavored to demonstrate, special circumstances were explicitly plead. And, from evidence introduced at trial, a reasonable jury could find that the unique conditions were sufficiently established so as to warrant lifting the case from application of the general rule.

Second, as the point is also labored above, the special circumstances manifest here do in fact qualify the case for treatment as an exception. The underlying events did not pertain in general terms to an ordinary brokerage account customer of Bear Stearns, but to one particular client who was then engaged in a business relationship and consequential occurrences materially different from those of most other customers not only of Bear Stearns, but probably of most brokerage houses. That singular relationship, under the circumstances prevailing between the parties and manifest in relevant external events, entailed the performance by Bear Stearns of responsibilities that far exceeded those associated with a common broker/client relationship and could thus give rise to obligations transcending the limited duties normally associated with the ordinary account.

During the course of their dealings, especially during the exceptional events of late 1994 and early 1995, the evidence showed that the parties' relationship engaged Bear Stearns in providing to Kwiatkowski far more than mere incidental information from time to time. Rather, it entailed a course of dealings and conduct that included Bear Stearns providing substantial advice relating to the timing, size and placement of Kwiatkowski's accounts. The performance of these services encompassed in particular Bear Stearns's response to the unique financial peril in which Kwiatkowski found himself at the time. Bear Stearns played a substantial role first in enabling Kwiatkowski to place himself in a situation of significant financial danger, and subsequently in endeavors to assist him extricate himself from the risk. In so doing, Bear Stearns performed its responsibilities in a manner a reasonable jury could determine did not comport with the standard of due care of a reasonable broker acting under similar circumstances.

Third, the theory of liability and the corresponding legal duty in question here are not grounded on Bear Stearns's obligation to provide any particular item of investment advice or information, but on its failure to exercise the reasonable care and display the skill and standard of conduct expected of a prudent broker under the circumstances that prevailed here. The case thus does not turn necessarily on a brokerage firm's furnishing or omitting to furnish any given materials, but more generically on Bear Stearns's deficient performance as a broker in its dealings with Kwiatkowski and handling his accounts under the circumstances, as gauged by the degree of the firm's adherence to its internal procedures, industry rules and

practices and general standards embodied in the concept of the legal duty of reasonable case. In this regard, whether or not Bear Stearns transmitted to Kwiatkowski the investment material at issue here constituted but one of a number of other specific instances and means that exemplify the negligence Kwiatkowski alleged and the jury found.

On the basis of the whole of these considerations, the Court does not accept the proposition that this case supplies justifiable grounds for the ominous apprehensions or augurs the grievous consequences Bear Stearns portrays. The jury's verdict here, while sizable enough to capture attention and stir understandable concerns, absent a full comprehension of the context, should not distract from the underlying issues here involved. If Kwiatkowski's award raises eyebrows because of its exceptional amount, it does not follow that the legal basis upon which the jury grounded liability is remarkable. Rather, the recovery here is unusually big only because the amounts Kwiatkowski placed at risk were correspondingly large. The average investor does not hazard trading in inherently risky markets accounts valued at $6.5 billion. But the culpable conduct which gave rise to Bear Stearns's liability would have been no less wrongful whether the amount in controversy implicated hundreds of dollars or hundreds of millions.

The relative magnitude of what is at stake constitutes but one element that weighs in a fact finder's assessment of what a reasonably prudent broker would do or not do under the circumstances. In sum, despite its size, the jury's award to Kwiatkowski does not represent all of what it may be made out to be. As read by this Court, it neither alters the general rule defining the extent of a broker's liability in the ordinary case for failure to exercise due care in conducting affairs entrusted by a customer relating to the handling of a securities or commodities account, nor

does it establish any new or enlarged rule of general application. The verdict thus may be sustained as fitting comfortably within the framework of existing legal doctrine.

Bear Stearns's argument that a decision against it here portends a litigious bane for every other securities dealer ignores the uniqueness of the circumstances of this case already described. It may be worth repeating, in direct answer to any concerns and prophecies of apocalyptic times ahead for all brokerage houses, what Bear Stearns itself is best situated to attest. Just as Kwiatkowski himself and his singular relationship with Bear Stearns, as well as the extraordinary occurrences of late 1994 and early 1995 relating to Kwiatkowski's unprecedented foreign currency futures trading, were not everyday happenings then, neither are they likely to be commonplace recurrences in the future.

Most of human experience unfolds and is woven by one-time contingencies that serve to limit the repetition and predictability of events. Even if life's tape could be rewound and replayed, the odds of reconstructing precisely the same phenomenon are, to understate mildly, highly improbable.[55] A different combination of brokers and executives at Bear Stearns, or at any other brokerage firm, would not necessarily make the same fateful choices that produced the harmful results witnessed here. Nor would another Kwiatkowski necessarily take the same hazardous plunge.

To be sure, much of the law is framed not by strict identities, but by fair resemblances. And the choices any person makes at any given moment may be swayed, even if in subtle, incremental ways, by what may have seeped into the record of the collective experience and diffused through common consciousness. Nonetheless, the law's wisdom builds on the accretion of the whole of human experience, assuring that even what has oc-

---

**55.** *See generally* Stephen Jay Gould, *Wonder-* *ful Life,* Ch. III, 287–88 (1989).

curred and is universally known on any particular occasion is not, in and of itself, decisive in directing the course of the next instance for which a precedent is invoked. Consequently, for circumstances truly bearing reasonable similarities, the rules adopted to serve ordinary, predictable fact patterns encountered day to day still suffice to safeguard against the calamities Bear Stearns asserts this case forebodes.

Fears conveyed about new, untoward implications of this case also do not reflect the reality that, even without any precedential value of this litigation to rely upon, the law books already are replete with cases raising the specific arguments and alarms Bear Stearns summons here. *See, e.g., Conway,* 16 F.3d at 506; *Leib,* 461 F.Supp. at 955; *see also Salomon Forex, Inc. v. Tauber,* 8 F.3d 966 (4th Cir.1993).[56] This recorded experience belies that the verdict in this case will, for the first time or in some drastically new way, inspire every investor who loses money in securities trading, particularly wealthy individuals who possess the wherewithal to litigate without temerity, to recover their losses by contesting their brokers' performance.

Under current legal principles applied in prior cases, some clients have won, and others have lost. Some were extraordinarily rich; others were of relatively moderate means. This Court sees nothing in the case at bar that would alter applicable legal doctrine in any way, that would undo any of these earlier results, or that should encourage a perception that any of the myriad broker/client controversies now in the making or inevitably to come, regardless of the outcome here, would be resolved in any way materially different on account of the jury verdict here. As already stressed, this Court is of the view that the verdict in this action was rendered in accordance with existing, well-established legal principles, not on the basis of any new duty or theory of liability not previously cognizable.

### ORDER

For the foregoing reasons, it is hereby

**ORDERED** that defendants' Motions for Judgment as a Matter of Law under Rule 50(b) and for a New Trial under Rule 59(a) are denied.

**SO ORDERED.**

---

**56.** The fact pattern in *Tauber* is instructive to the case at bar. Tauber lost $26 million from speculation on options and futures in foreign currencies. Sued for amounts due in excess of the collateral in his trading account, Tauber defended that his transactions with the broker were illegal and unenforceable, and counterclaimed alleging negligence by the broker. The court, sustaining the district court's decision against Tauber, summarized the pertinent facts bearing on this point:

> Tauber traded with more than a dozen other companies besides Salomon Forex, exchanging billions of dollars worth of currency. He compared prices from various sources and bought currency at the most advantageous rate, often using one transaction to cover the risks of another. Tauber individually negotiated terms for these currency transactions, both with Salomon Forex and with other companies.... Tauber's wholly owned foreign currency trading company ... holds a seat on the nation's largest foreign currency exchange, the Philadelphia Stock Exchange. Tauber himself is worth, by the estimate of the district court, over half a billion dollars, and he owns extensive real estate holdings as well as foreign currency investments.

*Id.* at 969. *See also Tauber v. Bankers Trust Co.,* 230 A.D.2d 312, 657 N.Y.S.2d 686 (1st Dep't 1997).